UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **JAMES D. LYONS**, | ) | Case No. 4:03 CV 1620 |
| | ) | |
| Plaintiff, | ) | Judge Peter C. Economus |
| | ) | |
| vs. | ) | INTERIM REPORT AND |
| | ) | RECOMMENDATION OF |
| | ) | MAGISTRATE JUDGE |
| **SUZANNE BRANDLY**, et al., | ) | (Regarding Docket No. 187) |
| | ) | |
| Defendants. | ) | Magistrate Judge James S. Gallas |
| | ) | |

James D. Lyons is a prisoner in federal custody who suffers from a severe urological condition.  The allegations in his *pro se* complaint and amended complaint involve the central thesis that medical omissions and mistreatment, including the failure to promptly provide necessary corrective urological surgery, caused harm which progressed to the point that simple urethroplasty was no longer an option, and Lyons' urological condition which was initially easily treatable deteriorated, despite medical resources which should have been readily available including the provision of catheters and timely consultative examinations.  Lyons' theories of recovery include state-law claims for negligence and malpractice, violations of his Eighth Amendment Federal Constitutional rights raised in a *Bivens*-type claim [1] and violations under the Federal Tort Claims Act.

The "federal defendants" have moved for summary judgment based on the medical record. (ECF #187).  The "federal defendants" have not divulged their identities, but they have included

---

[1] See *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

4:03 CV 1620                                       2

clues in their motions by commencing their arguments with Lyons' arrival at FCI-Elkton on June

10, 1999 (Memo in Support, p. 1, 6, 8, 10, ECF #187-2).  This appears to align with the amended

complaint's exclusion of "non-federal" defendants under the first count of medical practice and

negligence claims against independent contractors and consultants for non-federal employees

(Amended Complaint, ¶292, ECF #6).  In the prior motion to dismiss, it appeared that defendants'

counsel was moving on behalf of all parties represented by the office of the U.S. Attorney (See

Motion to Dismiss and/or Motion to Change Venue) (ECF #153)).  However, it appears that the

motion for summary judgment covers Counts II, VI, and VII of the amended complaint (ECF # 6).

This is reinforced by the lack of reference to claims of medical negligence and malpractice from

Count I. [2].  Nowhere in the brief is there any argument concerning the state law claims.  Rather

counsel for the "federal defendants" begins with the assertion that a *Bivens*-type claim cannot be

based on mere negligence (Memorandum, p. 4).  There is repeated reference to the June 10, 1999

date when Lyons claims to have first arrived at FCI-Elkton (Memorandum, p. 1, 6, 9, 10).  And the

medical records he has attached *via* the affidavit from Rina Desai, Attorney Advisor for the

Northeast Regional Office of the Federal Bureau of Prisons, commences with the summary of the

medical treatment Lyons received at the Federal Medical Center in Butner, North Carolina following

his transfer from FCI-Elkton on November 4, 2003 (Aff. Desai, ¶¶1-3, Government Ex, A, ECF

#187-3).  Thus it would appear that this motion excludes what Lyons identifies as the "EMSA

defendants" or "non-federal defendants" (See Amended Complaint ¶292, Lyons' Aff. ¶10-15, 36,

---

[2] The allegations in the first count of the amended complaint concern negligence and malpractice by defendant
nurses Suzanne Brandly, Enid Blankenship, B.P. Burford, and Dr. Spagna and their employer EMSA Correctional Care
(Amended Complaint  ¶¶318-326).

4:03 CV 1620                                3

ECF #208).   Accordingly the "federal defendants'" motion for summary judgment does not apply to Lyons' claims in the first count of the amended complaint.

Commencing with the second count of the amended complaint, Lyons alleges that "federal employees" failed to properly treat his urological stricture condition upon his arrival at FCI-Elkton, which he alleges exhibited deliberate indifference to serious medical needs contrary to his constitutional rights under the Eighth Amendment (Amended Complaint ¶328).  Similar allegations raising *Bivens*-based complaints against federal employees appear in the Sixth and Seventh Counts (Amended Complaint, ¶368, 379).  Accordingly, the identities of the federal defendants, as best the undersigned can determine, in order of accusation are: in Count II -- Janet Bunts; Shirley Deeds; Daniel Hall; Moheb Sidhom; Dr. Ross Quinn; Dr. John Manenti; Mohammed Azam; Warden John LaManna; in Count VI –  Chris Williams; Chief Medical Officer Goforth; L. Smith; E. Barby; in Count VII –  Dr. Ellen Blair; Brian Jett; Bob Ellis;  Mary Ellis and Warden Arthur F. Beeler. [3]

The "federal defendants'" second oversight is the omission of the requisite certificate of uncontested facts.  In a case management conference order the undersigned instructed that if a motion for summary judgment is filed, the moving party shall also file a certificate of uncontested facts with the court.  A party opposing the motion for summary judgment challenging an uncontested

---

[3] Although a number of other defendants were accused of failing to provide adequate medical attention at a federal institution in violation of Lyons' Eighth Amendment rights under Count IV, these defendants ( Dr. Marrero, Dr. Growse, Gerry Payne and Warden Maryellen Thoms) were dismissed on Lyons' own motion (See ECF #100, 130). Further, judgment has been entered on the allegations against Dr. Black in Count III (See ECF #112) and the allegations against Dr. Ray were transferred to the United States District Court for the Eastern District of Kentucky (See ECF #92). The court entered judgment with the orders dismissing Count IV and transferring Count V on September 30, 2005 (See ECF #132).

4:03 CV 1620                                    4

fact must specifically identify the fact contested.  Any fact that is not contested shall be deemed

admitted.  (See Order, p. 4, ECF #42).  The "federal defendants" have not presented uncontested

facts, on the other hand, Lyons has included his certificate of uncontested facts with his supporting

affidavit (ECF #208).   His uncontested facts are unopposed and govern the disposition of the

pending motion for summary judgment, as follows:

1.      Lyons had a pre-existing urethral stricture condition dating back to
        at least 1995;

2.      Lyons' urological condition included a congenital narrow urethra and
        a passed kidney stone in 1995;

3.      Prior to Lyons' incarceration, Dr. Stephen Schissel was Lyons'
        treating general physician;

4.      Prior to Lyons' incarceration, Dr. Michael Conrad was Lyons'
        treating urologist See Exh. A MRs [Medical Records];

5.      Lyons had at least three urological procedures ("DVIU" & dilations)
        performed by Dr. Conrad in 1997;

6.      Dr.Conrad had prescribed self-dilation using a meatal dilator to
        Lyons to prevent urethral obstruction;

7.      Dr. Conrad's assessment was that urethroplasty would eventually be
        needed to provide definitive long-term resolution;

8.      Lyons did not experience a urethral obstruction from the date of his
        last surgical intervention by Dr. Conrad in August 1997 until
        November 1999;

9.      On August 19, 1998 Lyons was placed into federal custody.

10.     EMSA Defendants confiscated Lyons' meatal dilator on August 19,
        1998;

11.     The EMSA Defendants were aware of Lyons' urethral condition upon
        his incarceration as noted by the Intake ("Initial Medical Screening")
        MR of 8/19/1998;

4:03 CV 1620                                         5

12.    The EMSA Defendants documented their awareness of Lyons' acute urological complaints on 9/10/1998;

13.    The EMSA Defendants documented their awareness of Lyons having to self-dilate himself with a piece of plastic as noted in 10/11/1998 MR:

14.    The EMSA Defendants became further aware of Lyons' claim of having to use a piece of plastic to dilate himself due to urinary retention by virtue of a letter dated (10/16/1999) filed with the S.D.OH USDC by Mr. Hobson that included notification to the FCCCI Jail, EMSA and USMS.  See Dkt. #6, Exh. A. 11-12;

15.    The EMSA Defendants did not urologically examine Lyons until 10/21/1998;

16.    Dr. Paul Kaufman was Lyons' treating urologist during 1998-99 who first evaluated Lyons on 11/9/1998.  See Exh. B MRs;

17.    Dr. Kaufman performed a DVIU with a RUG on Lyons in 1998 as noted in 11/19/1998 MR, Exh. B;

18.    Dr. Kaufman prescribed Intermittent Self-Catheterization ("ISC") to Lyons after the 11/19/1998 surgery to prevent urethral obstruction;

19.    The EMSA Defendants never provided Lyons with any patient education to include demonstration thereof regarding ISC;

20.    The EMSA Defendants required Lyons to re-use his urethral catheters while at FCCC1;

21.    Dr. Kaufman performed a second RUG on Lyons as noted in 4/8/1999 MR that documented the continued presence of Lyons' severe mid-distal penile urethral stricture.  Exh. B;

22.    Dr. Kaufman's assessment was that urethroplasty would be needed to provide definitive treatment;

23.    Lyons was transferred to FCI Elkton, Ohio ("FCI ELK") on June 10, 1999.

4:03 CV 1620                                                6

24.     Prior to Lyons' transfer to FCI ELK, the BOP was aware of Lyons' urethral stricture condition and catheter use as documented by OMDT's 5/14/1999 Designation Form.  Dkt. #6, Exh. A.16;

25.     Upon Lyons' arrival at FCI ELK on 6/10/1999, the FCI ELK Federal Defendants (at least Bunts & Quinn) became aware of Lyons' urological condition and catheter use as documented by Lyons' BOP Intake Form dated 6/10/1999.  See BOP MRs attached to Dkt. #113, Exh. P-15-75;

26.     The FCI ELK Federal Defendants did not attempt to catheterize Lyons until 7/1/1999, which was unsuccessful.  See BOP MRs;

27.     The FCI ELK Federal Defendants did not provide Lyons with any smaller useful catheters until after 8/31/1999.  See BOP MRs;

28.     Dr. Ross Quinn (BOP) was Lyons' primary treating physician at FCI ELK with additional medical treatment by Drs. Williams and Manenti;

29.     Lyons experienced a urinary tract obstruction and retention on 8/24/1999 that required Dr. Quinn to catheterize Lyons with difficulty noted in 8/24/1999 BOP MR;

30.     Dr. Bradford Black was Lyons' treating urologist from August 1999 through January 2001 with his first consult on 8/26/1999.  See Exh. C MRs;

31.     Dr. Black perform two urological surgical procedures ("DVIU" to include 2 meatotomys) on Lyons on 10/18/1999 and again on 5/8/2000;

32.     Dr. Black never performed any urological X-rays or RUGs on Lyons;

33.     Dr. Black never obtained any of Lyons' prior urological MRs;

34.     Dr. Black prescribed ISC to Lyons after each surgical procedure to prevent urethral obstruction;

35.     The FCI ELK Federal Defendants provided Lyons with catheters for his ISC after the 10/18/1999 procedure, but required Lyons to perform his ISC in prison housing unit and to re-use his catheters until after 9/26/2000;

4:03 CV 1620                              7

36.  Urinary catheter manufacturers such as Rochester & Mentor Urology clearly state that catheters are for "Single-Use Only" due to risk of infection;

37.  The FCI ELK Federal Defendants never provided Lyons with any ISC patient education to include demonstration therefore as noted in the BOP MRs until after 9/26/2000;

38.  After the 10/18/1999 DVIU, Lyons was temporarily able to perform his ISC with a #20 Fr. catheter that due to difficulties was dropped to #14 catheter by January 2000.

39.  Dr. Black never provided Lyons with any patient education to include demonstration thereof regarding ISC to resolve Lyons' difficulties associated with his ISC except for the limited instruction provided on 10/4/2000 while Lyons was at Salem Community Hospital (OH);

40.  After the 5/8/2000 DVIU, Lyons was temporarily able to perform his ISC with a #20 Fr. catheter that due to difficulties was dropped to #16 Fr. catheter by November 2000;

41.  The BOP MRs from 10/29/1999 through 9/26/2000 document numerous occasions of Lyons' complaints of difficulty in performing his recommended ISC;

42.  The BOP MRs from 6/10/1999 through 1/29/2001 document catheter supply interruptions.

43.  The BOP MRs from 6/10/1999 through 10/10/2000 document at least four Urinary Tract Infections ("UTIs") requiring medical treatment.

44.  Dr. Black performed at least two other urological office procedures on Lyons in 1999 and 2000.

45.  On 10/3/2000 through 10/9/2000, Lyons was hospitalized at Salem Hospital for urosepsis;

46.  On 10/4/2000, Dr. Black noted Lyons' urethral slit (meatus) being a bit low;

47.  On 10/4/2000, Dr. Black approved and recommended additional lubricant and urethral injection method to improve Lyons' ISC;

4:03 CV 1620                                  8

48.     the FCI ELK Federal Defendants employed the improved ISC
        lubricant injection method for Lyons' ISC after 10/10/2000 through
        1/29/2001;

49.     On 1/11/2001, the FCI ELK Federal Defendants (Drs. Manenti &
        Quinn, HSA Azam, AHSA Sidhom and Warden LaManna)
        completed a Medical Referral Request (Form EMS-204.060) for
        Lyons to be medically transferred to FMC Lexington.  See Exh. E;

50.     Lyons was transferred to FMC Lexington, KY ("FMC LEX") on
        January 30, 2001;

51.     When Lyons was transferred to FMC LEX he was performing his
        ISC with a #16 Fr. catheter (usually a PVC catheter type) with some
        difficulties as noted in his BOP MRs;

52.     Dr. Maria Marrero (BOP) was Lyons' primary treating physician at
        FMC LEX who never personally urologically examined Lyons as
        indicated in his BOP MRs;

53.     Dr. Marrero completed a urological consult for Lyons regarding his
        recurrent urethral stricture;

54.     In mid-February 2001 Lyons experienced a serious UTI requiring
        treatment;

55.     Dr. Charles G. Ray was Lyons' treating urologist during 2001 while
        Lyons was at FMC LEX.  See Dkt. #158, Dr. Ray's MRs, Exh. E;

56.     Dr. Ray examined Lyons at FMC LEX on 2/22/2001, which was
        limited to a review of BOP MRs, patient history and general exam
        that noted Lyons' complaint of difficulty with ISC.  Dr. Ray did not
        catheterize Lyons.  Dr. Ray's assessment was "stable stricture
        disease".  Dr. Ray recommended that Lyons continued ISC and for
        a Retrograde Urethrogram ("RUG") be scheduled;

57.     On 3/23/2001, Dr. Ray performed a Cystoscopy & RUG on Lyons at
        his Office, which showed three urethral strictures.  Dr. Ray noted
        Lyons' increased difficulty with ISC.  Dr. Ray's assessment was
        "stable stricture disease", and recommended that Lyons continue
        ISC;

4:03 CV 1620                                        9

58.     Dr. Ray never provided Lyons with any patient education to include demonstration thereof regarding ISC to resolve Lyons' difficulties associated with his ISC;

59.     The FMC LEX Federal (medical) Defendants (Drs. Marrero & Growse, and HSA/PA Payne), nor any other PA or nurse, provided Lyons with any patient education to include demonstration thereof regarding ISC to resolve Lyons' difficulties associated with his ISC;

60.     The only step taken by the FMC LEX Federal Defendants to aid in Lyons' ISC was to allow "surgilube with tapered nozzle" (urethral lubricant injection method) on 2/22/2001.  See Dkt. #6, Exh. A.19. The KY tube method was only useful until 4/13/2001 while Lyons was still capable of using a #16 Fr. catheter;

61.     On 4/13/ 2001, Lyons developed an inflammatory condition in his scrotum and penile area that produced considerable swelling, and prevented Lyons from performing his ISC;

62.     On 4/19/2001, Dr. Ray examined Lyons at FMC LEX in connection with the inflammatory condition.  Lyons told Dr. Ray that he was having difficulty voiding and unable to ISC.  Dr. Ray did not catheterize Lyons, nor did he emplace a foley catheter.  Dr. Ray told Lyons not to ISC and stated that he would follow-up in two weeks;

63.     Dr. Ray's two week follow-up after 4/19/2001 did not occur;

64.     No lab tests were conducted regarding the 4/19/2001 inflammation episode.  The exact etiology of the 4/19/2001 inflammation episode was never determined.  Only Cipro (antibiotic) was given;

65.     On 5/17/2001, Dr. Ray examined Lyons at FMC LEX regarding his extreme difficulty in urinating.  Dr. Ray could not catheterize Lyons. Dr. Ray determined that Lyons' urethral stricture was impassable and recommended that a dilation & cystoscopy be performed at his Office immediately.

66.     On 5/18/2001, Dr. Ray performed a dilation with filliforms & followers and a cystoscopy on Lyons at his Office.  Dr. Ray emplaced a post-operative foley catheter.  Dr. Ray noted three urethral strictures without length measurement since a RUG was not done.  Dr. Ray treated Lyons for an UTI with Cipro.  Dr. Ray recommended that Lyons resume ISC with a smaller 14 Fr. catheter

4:03 CV 1620                              10

after foley removal.  Dr. Ray recommended a two week post-operative follow-up for Lyons at FMC LEX;

67.    Dr. Ray's two week follow-up after 5/18/2001 did not occur.

68.    From approximately 4/13/2001 through 5/21/2001, Lyons was unable to ISC.  without ISC or other intervention methods, Lyons became obstructed requiring urological intervention on 5/18/2001;

69.    On 5/3/2001, a BOP Administrative Remedy Response was signed by FMC LEX Warden Thoms, BP#237889-F1, that stated the "Urologist's [Dr. Ray] opinion was stable, . . . and your [Lyons'] Erectile Dysfunction ["ED"] is not related to your urethral condition';

70.    The BOP would not approve any elevation of Lyons' ED complaint by any treating physician;

71.    Dr. Ray refused to ever discuss the issue of Lyons' ED complaint with Lyons;

72.    On 5/31/2001, a letter was sent from Warden Toms to Congressman Fletcher stating that Lyons' urethral stricture condition was stable, permanent and unrelated to his complaint of erectile dysfunction according to Dr. Ray.  The 5/31/2001 letter was prepared in part by Clinical Director ("CD") Dr. Growse as noted by BOP MRs;

73.    During discovery in the E.D.KY USDC, Dr. Ray denied making the statements attributable to him as noted in the 5/31/2001 letter prepared by Defendants Dr. Growse & Warden Thoms;

74.    On 6/4/2001, Dr. Marrero completed a BOP Medical Transfer Summary of Lyons stating that Lyons' urethral stricture condition was stable and that Lyons' complaint of erectile dysfunction was not related to previous surgeries or the stricture according to Dr. Ray. See BOP MRs, Exh. E;

75.    On 6/14/2001, the finalized BOP EMS-413.0060 (Medical Treatment Completed) form stated Lyons' stricture was stable and there was no need of any further intervention or surgery;

76.    The aforementioned BOP Medical Summaries at FMC were prepared in part and approved by Dr. Growse as per BOP Policy;

77.    During discovery in the E.D.KY USDC, Dr. Ray denied making the statements attributable to him as noted in the FMC LEX Medical Transfer Summary that "there was no need of any further intervention or surgery";

78.    On 6/19/2001, Lyons was examined by BOP physician Dr. Morales who noted Lyons' hypospadias and catheterization trauma from ISC difficulties;

79.    On 7/5/2001, Lyons was transferred from FMC LEX to FTC Oklahoma;

80.    On 7/5/2001, Lyons was examined by Dr. Growse who noted that Lyons was having voiding problems, that the urological follow-up with Dr. Ray had not occurred, had persistent meatal sores, had a probable UTI, had bleeding when ISC, and that Lyons was unable to ISC, but approved Lyons' transfer from FMC LEX to "In-Transit Status";

81.    Lyons did not see Dr. Ray for his recommended post-operative follow-up after the 5/18/2001 dilation;

82.    During Dr. Ray's treatment of Lyons, Dr. Ray never recommended a meatal dilator for Lyons;

83.    During Dr. Ray's treatment of Lyons, Dr. Ray never recommended any lubricant injection method for Lyons' ISC;

84.    During Dr. Ray's treatment of Lyons, Dr. Ray never documented any recommendation or surgical alternative of urethroplasty as an option for Lyons to treat his urethral stricture;

85.    During Dr. Ray's treatment of Lyons, Dr. Ray never documented any specific references to BXO (Lichen Sclerosis);

86.    After Lyons' transfer from FMC LEX he developed further difficulties with his ISC requiring a reduction in catheter sizes;

87.    While Lyons was "In-transit" at FTC Oklahoma from 7/5/2001 until 7/25/2001 only a single page of medical notes has been located.  See BOP MRs, Exh. E;

88.    Lyons was returned to FCI ELK on 7/25/2001 until 8/22/2001;

4:03 CV 1620                                    12

89.     During 7/25/2001 through 8/22/2001, the FCI ELK Federal
        Defendants did not urologically examine Lyons, nor were any
        documentable steps taken to resolve Lyons' problems with ISC;

90.     During 7/25/2001 through 8/22/2001, the FCI ELK Federal
        Defendants required Lyons to re-use his catheters and perform his
        ISC (when able) in his housing unit;

91.     On August 22, 2001, Lyons was personally transported to FMC
        Butner, NC ("FMC BUH") by defendant Dr. Manenti;

92.     When Lyons was transferred to FMC BUH, he was not provided
        usable catheters until 8/25/ 2001 when Lyons was provided smaller
        #10 Fr. catheters;

93.     When Lyons was initially examined at FMC BUH, he was not
        provided usable catheters until 8/25/2001 when Lyons was provided
        smaller #10 Fr. catheters;

94.     Lyons' initial BOP treating physicians at FMC BUH were Drs.
        Sanchez and Silberman;

95.     On 8/24/2001, the FMC BUH Medical Staff (Dr. Silberman) noted
        Lyons' problems with ISC;

96.     The FMC BUH Medical Staff would not approve or employ any
        urethral lubricant injection method for Lyons' ISC until after January
        2002 that only comprised of an intermittent use of a lidocaine syringe
        only at Health Services by medical staff.  A usable lubricant injection
        method for use in Lyons' daily ISC was not implemented until
        October 2002;

97.     On 10/1/2001, Lyons was taken to Duke University Medical Center
        ("DUMC") and evaluated by Dr. Bruno who recommended further
        urological follow-up and testing to include: urinary cytologies;
        urinary culture & sensitivity; renal dedicated CT Scan; retrograde
        urethrogram (RUG) to evaluate to caliber of the urethral stricture;
        follow-up with Dr. Flynn (DUMC) for evaluation of RUG; See Exh.
        F;

98.     Lyons' urological follow-up at DUMC did not occur until 7/26/2002;

4:03 CV 1620                                      13

99.   On 10/23-24/2001, Lyons experienced a UTI and bladder retention
      (>1L) requiring catheterization by FMC BUH Medical Staff (RN
      Daniels) since Lyons was unable to ISC himself;

100.  On 11/27/2001, Lyons was seen by a different contracted consultant
      urologist (instead of DUMC), Dr. Ogle, for an initial consult.  Dr.
      Ogle documented Lyons' hypospadias with meatal ulceration, but did
      not catheterize Lyons, nor did he provide any patient education
      regarding Lyons' ISC difficulties.  Dr. Ogle recommended a voiding
      cysto-urethrogram (X-Ray/RUG);

101.  On  2/22/2002,  Dr.  Ogle  performed  a  RUG/Retrograde
      Urethrocycstogram at Granville Medical Center that noted "A linear
      defect noted at the mid penile urethra that he was unable to further
      quantify;

102.  On 4/15/2002, Lyons had a UTI and bladder retention that required
      catheterization by PA Spiller;

103.  On 5/5/2002, Lyons had a bladder retention and probable UTI that
      required catheterization by PA Tanner who also noted Lyons Meatal
      ulcerations and firm areas of scar tissue in Lyons' urethra;

104.  In May 2002, Lyons' BOP treating physician at FMC BUH became
      Dr. Ellen Blair with PA Spiller.

105.  On 5/22/2002, Dr. Ogle recommended that based upon Lyons'
      complex urological history of multiple DVIUs, recurrent urethral
      stricture and 2/22/2002 cystogram, Lyons should be referred back to
      DUMC;

106.  Lyons experienced additional bladder retentions on 5/11/2002 &
      7/10/2002 that required catheterization by FMC BUH Medical Staff
      due to Lyons' inability to ISC;

107.  On 7/26/2002, Lyons was seen by Dr. Murphy (DUMC) who
      urologically examined Lyons to include catheterizing Lyons.  In
      order to resolve Lyons' problems with ISC, Dr. Murphy
      recommended a meatal dilator, coude catheters and a lubricant
      injection method to aid in Lyons' ISC.  An actual instruction sheet
      was prepared to take back to FMC BUH.  Dr. Murphy stated in his
      MR: "Patient previously seen by Dr. Bruno last October [2001] -
      never had any workup completed for issues that are beyond my

capabilities to understand".  Dr. Murphy recommended a RUG to assess the extent of the stricture disease; see DUMC MRs, Exh. F;

108.    On 8/20/2002, DUMC performed a RUG on Lyons that indicated "severe stricturing and linear calcification throughout the course of the distal half of the penile urethra"; Exh. F;

109.    On 9/12/2002, Lyons was seen by Dr. Blair who noted his ISC problems;

110.    On 9/18/2002, Dr. Webster (DUMC) diagnosed Lyons' urethral stricture as "obliterative pendulous urethral stricture". Dr. Webster's treatment recommendations included multi-stage urethroplasty, perineal urethrostomy (urinary tract by-pass) and continued ISC (until complete failure); Exh. F;

111.    After 9/18/2002 until 11/21/2002, Lyons was required to continue to ISC (4-6 times/day) with a #10 Fr. coude catheter since the FMC BUH Federal Defendants would not approve alternative urological treatment.

112.    On 11/21/2002, Lyons developed stricture impassability and major bladder retention (>1L) in which the FMC BUH Medical Staff was unable to catheterize Lyons that required the placement of a suprapubic catheter at DUMC;

113.    On 11/22/2002, the FMC BUH Federal Defendants stated that they would not approve any urethroplasty procedure for Lyons, but would allow the perineal urethrostomy;

114.    On January 2, 2003, with the BOP's surgical approval, Drs. Peterson & Webster, performed a perineal urethrostomy on Lyons at DUMC;

115.    As a result of Lyons' perineal urethrostomy, Lyons is now required to sit down to void.  Lyons' urinary tract is now severed at the perineum (at by-pass pont), Lyons' pendulous penile urethra is now scarred shut and Lyons is incapable of conventional procreation;

116.    After the 1/2/2003 perineal urethrostomy, Lyons required wound care and urological follow-up at DUMC;

4:03 CV 1620                                15

117.    As a result of a urethral tissue biopsy taken on 1/2/2003, Lyons was
        informed by Dr. Peterson (DUMC) that lichen sclerosis (BXO) was
        present in Lyons' urethral stricture scar tissue.

118.    On 2/4/2003, Dr. Blair prepared a Medical Transfer Summary (later
        dated 2/24/2003) that stated that Lyons was healed from the
        1/2/2003, no further treatment was needed and Lyons could be
        transferred back to regular facility since medical treatment was
        completed.  Dr. Blair's medical summary was incorporated into the
        EMS-413.060 (dated 2/26/2003).  See BOP Summaries, Exh. E;

119.    On 3/21/2003, Lyons had a follow-up evaluation by Dr. Peterson who
        stated that in regards to Lyons' wound, Lyons was healing well, but
        not fully healed (". . . small amount of granulation tissue on the left
        side where the wound had opened prior.") Exh. F;

120.    In March 2003, Dr. Ray provided sworn statements to the Kentucky
        Medical Board regarding Lyons' complaints in 2001;

121.    On 4/1/2003, Lyons was placed "in-transit" by the FMC BUH
        Federal Defendants without any wound care instructions in Lyons'
        transit orders;

122.    During 4/1/2003 through 7/2/2003, Lyons was in at least four
        different transfer facilities.  The limited BOP MRs from during this
        time period do not document any wound care being provided to
        Lyons;

123.    On 7/2/2003, Lyons arrived back at FCI ELK and informed the FCI
        ELK Medical Staff of his changed urological system (perineal
        urethrostomy) and increased difficulty in urination;

124.    Lyons was treated for a UTI in late July 2003;

125.    On 8/19/2003, Dr. Quinn became aware of Lyons' increased
        difficulty in urinating through the perineal urethrostomy and
        attempted to catheterize Lyons, which failed;

126.    On 8/2/2003, Lyons was hospitalized at Saint Elizabeth's Hospital
        (Youngstown, OH) due to Lyons' bladder retention and increased
        difficulty in urination;

127.  On 8/22/2003, Lyons required an emergency surgery (placement of a suprapubic catheter, #12 Fr. by Dr. David Pichette (urologist) due to the "internal collapse: of the perineal urethrostomy;

128.  Dr. Pichette provided standard catheter care recommendations for Lyons' suprapubic catheter to include: upgrading the size to #16 Fr. within a month and catheter irrigations of dilute vinegar/saline solutions to keep the suprapubic catheter clean;

129.  The FCI ELK medical staff did not perform the suprapubic catheter care instructions as recommended by Dr. Pichette until after 9/13/2003 and required Lyons to perform his own wound care and dressing changes in his prison housing unit;

130.  On 9/12/2003, Lyons developed a serious UTI (borderline urosepsis) with a fever that required treatment with antibiotics;

131.  On 9/13/2003, the FCI ELK Medical Staff began daily irrigation of Lyons' suprapubic catheter, but did not change Lyons' suprapubic catheter;

132.  In October 2003, a medical transfer request (dated 10/8/2003) was prepared by the FCI ELK Defendants (Azam, Quinn, Manenti, AW Hertel and Warden Bezy);

133.  On 10/16/2003, Lyons' suprapubic catheter failed requiring Lyons to be taken to Saint Elizabeth's ER again to have another suprapubic emplaced.  The ER physician was only able to emplace a smaller #10 Fr. suprapubic catheter without any mounting fixtures.  Urological follow-up was recommended to upgrade the catheter.

134.  After the 10/16/2003 suprapubic catheter emplacement, Lyons was not seen by any urologist until after his transfer back to FMC BUH;

135.  On 11/4/2003, Lyons was transferred back to FMC BUH by special air charter by order of the FCI ELK Defendants (Azam, Quinn, Manenti, AW Hertel and Warden Bezy);

136.  During 7/2/2003 through 11/4/2003, Lyons never saw Dr. Black;

137.  On 11/21/2003, Lyons was seen by Dr. Tash (DUMC) who replaced the suprapubic catheter and recommended re-operation of Lyons' failed perineal urethrotomy.

138.    On 12/15/2003, Lyons had a surgical revision performed on his perineal urethrostomy by Drs. Tash and Webster at DUMC;

139.    On 1/7/2004, Lyons had a post-operative visit with Dr. Tash who removed the emplaced foley catheter and gave Lyons instructions for post-operative ISC of the perineal urethrostomy to maintain urethral patency.   The post-operative ISC instructions included patient education and demonstration thereof; See DUMC MRs, Exh. F;

140.    On 1/8/2004, the FMC BUH Medical Staff (Drs. Blair & Bonner, HSA B. Ellis, DON M. Ellis, PA Spiller, RN Hollis & Mr. Livingston) held a meeting with Lyons to implement the post-operative ISC recommendations by DUMC of the perineal urethrostomy to be conducted at Health Services;

141.    On 2/18/2004, Lyons had a follow-up visit with Dr. Tash who recommended maintaining the ISC to prevent recurrence of the urethral strictures.  Dr. Tash stated in part: ". . . I am going to keep him on this [ISC] because I do not want any recurrence of his stricture disease and then given the fact that he has suboptimal care in his living facility I think the better part is to continue with calibration once weekly . . ."; See Exh. F;

142.    On 5/21/2004, Lyons had his last follow-up visit with Dr. Tash.  Dr. Tash noted that although the perineal urethrostomy was an effective short-term remedy, only a two-stage repair would allow Lyons the option to have children as she had stated previously in her 4/17/2004 letter ("natural impregnation cannot happen through the perineal urethrostomy").  Dr. Tash noted Lyons' ED complaints and penile scarring, and stated that a referral to see the Dr. Donatucci (DUMC ED Specialist) was required; See Exh. F;

143.    On 2/18/2005, Lyons had a follow-up visit with Dr. Sherman (DUMC).  Dr. Sherman recommended that Lyons should continue the perineal ISC and his physical exam noted Lyons' Right-side Penile Shaft Plaques, and that follow-up for Lyons' ED complaints would need to be done by erectile dysfunction specialists; See Exh. F;

144.    Lyons' ED complaint has never been evaluated despite his numerous complaints.

4:03 CV 1620                                   18

145.   Lyons' urethral stricture condition has deteriorated over his incarceration from 1998 through 2007;

146.   Lyons has suffered a number of urological complications as a result of urological treatment and procedures to include UTIs, hospitalizations, operations, abscesses, and other infections;

147.   Definitive urological treatment for Lyons' urethral stricture was never provided by the Federal Defendants to include the BOP and United States;

148.   The BOP's "Conservative Treatment" of prolonged ISC failed;

149.   Lyons requires medical (urological) treatment in the form of a two-stage repair (multi-stage urethroplasty) to restore and provide definitive treatment of his urethral stricture.


Under Rule 56 of the Federal Rules of Civil Procedure granting a motion for summary judgment is only proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  In determining whether there is a genuine issue of material fact all inferences drawn from the underlying facts contained in affidavits, pleadings, responses to discovery requests, and depositions must be viewed in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).  A court must inquire "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  The court may not make credibility determinations or weigh the evidence when ruling on a motion for summary judgment. *Anderson*, 477 U.S. at 255.  The burden is upon the movant to

demonstrate the absence of a genuine issue of material fact. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir. 1979), *cert. dismissed* 444 U.S. 986 (1979). However, the nonmoving party is obliged to produce some evidence other than mere pleadings themselves to demonstrate that there is a genuine issue for trial. *Celotex Corporation v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party must produce significant probative evidence in support of the complaint to defeat the motion for summary judgment through affidavits or admissions on file. *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 339-40 (6th Cir. 1993). In the final analysis, "the threshold inquiry . . . [is] whether there is a need for trial -- whether in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250; *Moore*, 8 F.3d at 340. Once the nonmoving party has responded , the court must view the facts in the light most favorable to the nonmoving party. *Darrah v. City of Oak Park,* 255 F.3d 301, 304 n.1 (6th Cir. 2001).

Lyons argues that his opposition to the "federal defendants'" motion for summary judgment, includes his uncontested facts, supplemental declaration and his verified complaint. A verified complaint or an additional affidavit is sufficient to respond to a motion for summary judgment. See Fed. R. Civ. P. 56(e); *Smith v. Campbell*, 250 F.3d 1032, 1036 (6th Cir. 2001); *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992) (a verified complaint [either handwritten or typewritten] would have the same force and effect as an affidavit and would give rise to genuine issues of material fact); *Hooks v. Hooks*, 771 F.2d 935, 946 (6th Cir. 1985) ("[S]ince plaintiff's complaint was verified, to the extent that the allegations herein are based on personal knowledge, it satisfies the requirements

4:03 CV 1620                                20

of Rule 56(e) as an opposing affidavit."). There is no question that his "supplemental declaration in support" suffices under 28 U.S.C. §1746.  The question is whether his amended complaint is verified as Lyons argues (See ECF #6).  Lyons' verification of his amended complaint is insufficient.  28 U.S.C. §1746 requires the statement in writing to be "subscribed by him as true under penalty of perjury, and dated, in substantially the following form: . . . (2) if executed within the United States, its territories, possessions or commonwealths: 'I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct . . .'" Only substantial compliance is required- a statement that the document is true accompanied a declaration under penalty of perjury. See *Matsuda v. Wada*, 101 F.Supp.2d 1315 (D. Haw. 1999).  Lyons has omitted the critical reference to penalty of perjury, and only certifies in part that the matters are true and correct, so both requirements for verification under §1746 are lacking. (See Amended Complaint, p 77, ECF #6).[4]  Accordingly, for purposes of Rule 56(e) only Lyons' supplemental declaration and his "uncontested facts" will be weighed in assessing the "federal defendants" motion for summary judgment."


*Bivens Allegations:*

        In *Bivens*, the Supreme Court created a private right of action for damages against federal officers who are alleged to have violated a citizen's constitutional rights.  See *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 66, 122 S.Ct. 515, 519, 151 L.Ed.2d 456 (2001); *Bivens*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).  Although *Bivens* involved Fourth Amendment rights,

---

        [4] Lyons' verification reads in full: "I James D. Lyons, pursuant to 28 U.S.C. §1746, certify that the contents of the foregoing COMPLAINT are true and correct; except as to those matters and things stated therein upon information and belief, and as to those matters and things the complainant (sic) believes them to be true also."

its principle was extended to the Eighth Amendment in *Carlson v. Green,* to promote a right of action against individual prison officials when the only alternative was a Federal Tort Claims Act claim against the United States, which the Supreme Court believed was insufficient to deter unconstitutional acts by individuals.  *Carlson*, 446 U.S. 14, 18-23, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1998); *Correctional Services Corp.*, 534 U.S. at 67-68, 122 S.Ct. at 520.  [5]

Lyons' allegations begin with the legal mistake of being framed in terms of claims against defendants in both their individual and official capacities (Amended Complaint, ¶23, 43, 51).  The doctrine of sovereign immunity bars suits against the United States and suits for pecuniary damages against the officers and agents in their official capacities.  See *Blakely v. U.S.*, 276 F.3d 853, 870 (6th Cir. 2002);  *Ecclesiastical Order of the Ism of Am, Inc. v. Chasin*, 845 F.2d 113, 115-16 (6th Cir. 1998).  The United States is immune from suit for pecuniary damages unless it has unequivocally waived its sovereign immunity.  *Blakely*, 276 F.3d at 870; *Reed v. Reno*, 146 F.3d 392, 397-98 (6th Cir. 1998).  Sovereign immunity accordingly bars the claims against the federal defendants in their

---

[5] While in general the Supreme Court found that Congress views *Bivens* and the Federal Tort Claims Act "as parallel, complementary cause of action."  The Federal Tort Claims Act is an "exclusive remedy" against claims of malpractice by government health personnel. See 42 U.S.C. §233(a); *Carlson*, 446 U.S. at 19-20.

When a federal employee is sued for negligent or wrongful conduct, 28 U.S.C.§ 2679(d)(1) and (2) empowers the Attorney General to certify the employee's actions as being within the scope of office and employment at the time of the incident out of which the claim arose, resulting in the employee's dismissal and substitution of the United States in place of the employee. Thereafter the litigation is governed by the Federal Tort Claims Act.  See *Osborn v. Haley*, - U.S. -, 127 S.Ct. 881, 894, 166 L.Ed.2d 819 (2007).  In this case, however, the government refuses to certify that the defendant medical personnel were acting within the scope of office and employment as required by 28 U.S.C. §2679(d)(1). The Attorney General's decision not to certify the federal defendants' actions, especially since this was pointed out in the prior report and recommendation  (See *Lyons v. Brandly*, 2006 WL 2709792 (N.D. Ohio), indicates that the federal defendants were acting on their own accord, outside the scope of their offices and employment, and are subject to individual liability.

The individual federal defendants have recourse under §2679(d)(3) to petition the court to make a scope of employment certification.  See *Osborn*, 127 S.Ct. at 894.  That has not occurred.

4:03 CV 1620                                              22

"official capacities."  since the claims constitute an action against the United States.  See *Ashbrook v. Block*, 917 F.2d 918, 924 (6th Cir. 1990).  The allegations of action in the official capacity under these *Bivens*-based claims must be dismissed as a matter of law.

Continuing on with the claims against the defendants in their individual capacities, when presented with a *Bivens*-based action, a court can in most instances borrow freely from civil rights principles developed under 42 U.S.C. §1983.  This is because the same rationales apply to §1983 and  *Bivens* actions and they are in effect identical except for the requirement of a state actor under §1983 and a federal action under a *Bivens*-based claim.  See *Ruff v. Runyon*, 258 F.3d 498, 502 (6th Cir. 2001); and see *Martin v. Sias*, 88 F.3d 774, 775 (9th Cir. 1996); *Abella v. Rubins*, 63 F.3d 1063, 1065 (11th Cir. 1995); *Butz v. Economou*, 438 U.S. 478, 500-01, 98 S.Ct. 2894, 2907-08, 57 L.Ed.2d 895 (1978) (extending qualified immunity principles from §1983 to federal officials under a *Bivens* claim).

The federal defendants contend in their motion for summary judgment that they are entitled to qualified immunity against Lyons" *Bivens*-based claims under the Eighth Amendment. They argue that Lyons' *Bivens* claims are barred because Lyons had a severe pre-existing urological condition that received a significant amount of medical care at FCI-Elkton and was transferred temporarily to FMC-Butner where he received around-the-clock medical care from August 22, 2001 through April 1, 2003.  Thereafter, he was permanently transferred to FMC-Butner on November 4, 2003 and received medical treatment from medical specialists at local hospitals and at Duke University Medical Center.   The federal defendants conclude that Lyons was provided with

4:03 CV 1620                                        23

medicine and constant follow-up medical treatments to improve his condition and as a result of the

extensive history of medical care Lyons' *Bivens* claim should be barred by the doctrine of qualified

immunity.  The federal defendants support theirs argument with references to Lyons' own amended

complaint and incorporate medical records through affidavits from record custodians.


Government officials performing discretionary functions are shielded from civil liability

"insofar as their conduct does not violate clearly established statutory or constitutional rights by

which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct.

2727, 73 L.Ed.2d 396 (1982).   Generally, "[u]ntil this threshold immunity question is resolved,

discovery should not be allowed."  *Harlow*, 457 U.S. at 817-18; *Crawford-El v. Britton*, 523 U.S.

574, 597-98 (1998).  Lyons, though, has been permitted to conduct discovery as evidenced by his

references to the medical records in his uncontested facts, and his "supplemental declaration."


Lyons as a prisoner asserting a *Bivens* claim against individual defendants for violations of

his Eighth Amendment rights through their failure to provide sufficient and proper medical care,

must establish that defendants showed "deliberate indifference" to his "serious medical needs."

*Wilson v. Seiter*, 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (quoting *Estelle v.

Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Terrance v. Northville Regional

Psychiatric Hospital,* 286 F.3d 834, 843 (6th Cir. 2002).  Such a showing has both objective and

subjective components.  See  *Helling v. McKinney*, 509 U.S. 25, 35, 113 S.Ct. 2475, 125 L.Ed.2d

22 (1993); *Thaddeus-X v. Blatter*, 175 F.3d 1378 (6th Cir. 1999).  The objective component requires

a showing of 'serious medical need' whereas the subjective component requires a showing that the

defendant actually knew he was creating a substantial risk of harm and deliberately disregarded that risk by failing to take the measures to abate it.  See *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Helling*, 509 U.S. at 35-36; *Tucker v. Rose*, 955 F.Supp. 810, 815 (N.D. Ohio 1997).  As the Supreme Court emphasized in *Wilson*, 'the source of the intent requirement is . . . the Eighth Amendment itself, which bans only cruel and unusual punishment.' 501 U.S. at 300.  The Supreme Court elaborated that 'if the pain inflicted is not formally meted out as *punishment* by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify.'  *Id.*

A court evaluating a prison's Eighth Amendment *Bivens* complaint must 'inquir[e] into a prison official's state of mind when it claimed that the official has inflicted cruel and unusual punishment,' (*Wilson*, 501 U.S. at 299), because only deliberate indifference 'can violate the Eighth Amendment[;] allegations of 'inadvertent failure to provide adequate medical care' or of a 'negligent . . . diagnos[is]' simply fail to establish the requisite culpable state of mind.  *Id.* at 297.  (emphasis and internal citations omitted) (quoting *Estelle*, 429 U.S. at 106).  This distills to the basic element that 'a prison official cannot be found liable under the Eighth Amendment. . . unless the official knows of and disregards an excessive risk to inmate health or safety.'  *Farmer*, 511 U.S. at 837.

Lyons bears the burden of showing that the federal defendants are not entitled to qualified immunity.  *Blake v. Wright*, 179 F.3d 1003, 1007 (6th Cir. 1999).  To do this he must present specific allegations of prohibited conduct.  *Dominque v. Telb*, 831 F.2d 673, 676 (6th Cir. 1987).  Lyons therefore must establish with particularity that the federal employees violated some clearly

4:03 CV 1620                                      25

established statutory or constitutional right in order to strip them of the protection of qualified immunity.  *Id.*

To achieve this he, "cannot rely on the hope that the trier of fact will disbelieve the movants' denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  *Street v.  J.C. Bradford & Co.*, 886 F.3d 1472, 1479 (6th Cir. 1989).  The trial court has no obligation to search the  record to establish that it is "bereft of a genuine issue of material fact."  *Id;* and see *Chicago Title Ins. Corp. v. Magnusson*, 487 F.3d 987, 995 (6th Cir. 2007).  Rule 56 allocates the duty of sifting through the record, "to the opponent of the motion, who is required to point out the evidence, albeit it evidence that is already in the record, that creates an issue of fact."  *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379 (6th Cir. 2007). Lyons bears the burden of proof just as he would at trial.  See *Williams v. Mehra*, 186 F.3d 685, 692-93 (6th Cir. 1999), citing *Celotex*, 477 U.S. at 322; and see *Wegener v. City of Covington*, 933 F.3d 390, 392 (6th Cir. 1991); *Dominque*, 831 F.2d at 676-77. "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows and disregards an *excessive* risk of inmate health or safety; the official must be both aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Williams v. Mehra*, 186 F.3d 685, 691-92 (6th Cir. 1999)(emphasis supplied), quoting, *Farmer*, 511 U.S. at 837;.   Consequently, Lyons has the obligation of pointing to specific evidence in the medical record which would support his *Bivens* claim in regard to particular individuals.  This type of reference to particular federal defendants has been omitted.  Lyons' uncontested facts and affidavit do establish a serious medical condition but

4:03 CV 1620                                         26

his allegations of indifference fail to identify which particular individual was responsible for neglect or omission.

The Sixth Circuit has vacillated between a three-step or two-step analysis when evaluating the assertion of qualified immunity.  See *Dickerson v. McClellan*, 101 F.3d 1151, 1157-58 (6ᵗʰ Cir. 1996); *Williams v. Mehra*, 186 F.3d at 691 (3-step test qualified immunity analysis); *Dunigan v. Noble*, 390 F.3d 486, 491 n. 6 (6ᵗʰ Cir. 2004) (two-step analysis); *Estate of Carter v City of Detroit*, 408 F.3d 305, 310 n. 2 (6ᵗʰ Cir. 2005) (advocating two-part test in light of *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001), but conceding "the three-step approach can be said to capture the holding of *Saucier*. . .") The court must inquire, whether "[t]aken in the light most favorable to the party asserting the injury to the facts alleged shows the officer's conduct violated a constitutional right."  *Saucier*, 533 U.S. at 201. Under either approach Lyons' evidence is insufficient to demonstrate that an official's conduct violated Eighth Amendment rights. [6]

In *Saucier* the court analyzed a claim premised on the Fourth Amendment. Fourth Amendment claims are evaluated under the standard of objective  reasonableness.  See *Graham v.*

---

[6]  The second step under *Saucier* is "whether the right was clearly established." *Id.*, 533 U.S. at 201. Whereas, under the three-step approach in *Dickerson*, the court must determine whether a constitutional violation occurred, whether the right violated was clearly established and finally whether plaintiff has alleged sufficient facts and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional right." *Id.*, 101 F.3d at 1157-58.  Employing the third step in *Dickerson* would in the undersigned's view lead to confusion, rather than being helpful because the reliance simply on objective reasonableness is more directed to Fourth Amendment claims rather than Eighth Amendment claims which require proof of objective and subjective components.

4:03 CV 1620                                           27

*Connor*, 490 U.S. 396, 397, 109 S.Ct. 1865, 1873, 104 L.Ed.2d 443 (1989). [7]  However, to sustain

claims under the Eighth Amendment, as noted above, require both a showing of objective

unreasonableness and a subjective intent by identifying the particular "mind to examine." *Wilson*

*v. Seiter*, 501 U.S. at 300 ("some mental element must be attributed to the inflicting officer before

it can qualify [as punishment])." *Harper v. Albert*, 400 F.3d 1052, 1066 n. 19 (7th Cir. 2005).  As

illustrated in *Harper*, a failure to identify the officer and linked with the specific conduct in violation

of the Fourth Amendment is not critical because no matter which officer did not directly beat him,

the other officer could be held responsible for failing to intervene.  *Harper*, 400 F.3d at 1066 n. 19;

and see *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000).  Conversely, under Eighth Amendment

violation claims, "[i]n order for courts to satisfy the mandate to inquire into the state of mind of

prison officials who have allegedly caused a constitutional violation . . . it is most imperative that

we are provided with 'identify the culprits'; for '[w]ithout minds to examine, we cannot conduct an

individualized inquiry.'" *Harper*, 400 F.3d at 1065 quoting *K.F.P. v. Dane County*, 110 F.3d 516,

519 (7th Cir. 1997).

─────────────────────

[7]  *Graham* explained:

Differing standards under the Fourth and Eighth Amendments are hardly surprising: the terms "cruel" and "punishments"
clearly suggest some inquiry into subjective state of mind, whereas the term "unreasonable" does not. Moreover, the less
protective Eighth Amendment standard applies "only after the State has complied with the constitutional guarantees
traditionally associated with criminal prosecutions." *Ingraham v. Wright,* 430 U.S. 651, 671, n. 40, 97 S.Ct. 1401, 1412,
n. 40, 51 L.Ed.2d 711 (1977). The Fourth Amendment inquiry is one of "objective reasonableness" under the
circumstances, and subjective concepts like "malice" and "sadism" have no proper place in that inquiry.[footnote omitted]
*Graham v. Connor,* 490 U.S. at 398-399, 109 S.Ct. at 1873.

4:03 CV 1620                                          28

The format Lyons has chosen treats the federal defendants as jointly and severally liable, and omits the *scienter* requirement applicable to each individual.  Lyons claims that medical procedures were ordered but not performed.  He identifies physicians, but then at best attributes failure to a smaller group, *e.g.*, "the FCI Elk medical staff did not perform the suprapubic catheter care instructions as recommended by Dr. Pichett . . ." (Uncontested fact No. 129), or in other allegations he refers to defendants *en mass*, *e.g.*, "I was dependent upon the FCI Elk BOP/Federal Defendants for catheters and catheter supplies."  (Lyons Aff. ¶54).

Lyons' repeated references to the "federal defendants" or "FCI Elkton defendants," etc., in his uncontested facts and supplemental declaration are insufficient to controvert the federal defendants' motion for summary judgment in this *Bivens*-based Eighth Amendment claims.  His allegations fall short of demonstrating that the offending official possessed "a sufficiently culpable state of mind in denying medical care."  *Estate of Carter*, 408 F.3d at 311; *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004).   Further, in those instances where Lyons does refer to a particular defendant, his allegations are insufficient to show that even an objective violation in the Eighth Amendment right occurred.   The allegations demonstrate differences in medical care from a global perspective which fail to indicate the fault of any particular individual member of the defendant medical personnel.

To surmise subjective intent for the state of mind to harm, Lyons must either allege direct evidence of ill-will or malice by the official or circumstantial evidence of awareness of medical need, responsibility to carry out medical treatment, and at least neglect of that responsibility to a

4:03 CV 1620                                                29

degree satisfying Eighth Amendment criteria developed from *Estelle v. Gamble, supra*.  Lyons

cannot sustain his opposition to summary judgment by claiming that all defendants were blanketed

in malice toward him simply because he alleges that he suffered harm under their care. A sworn

statement of a specific incident demonstrating each "federal defendant's" awareness, particularized

on an individual basis, of medical need combined with willful neglect, again particularized to each

individual accused to show how state of mind is necessary.


Additionally, many of the uncontested facts specify individuals who are not parties to this

action or parties who had been identified only under counts three, four and five which are not part

of the federal defendants' motion for summary judgment, such is the allegations against Dr. Black

and Dr. Ray.  Consequently Lyons has failed to meet his burden of controverting the "federal

defendants'" assertion of qualified immunity and summary judgment should be entered on this point

granting the "federal defendants" summary judgment on the basis of qualified immunity.


*Negligence Under Count I:*

The "federal defendants" also argue that Lyons cannot maintain a negligence claim with

reference to amended complaint ¶¶ 285-89 and 291-97.  The "federal defendants" err in their reading

of the amended complaint.  It is clear that ¶¶285 through 289 deal with Lyons' grievances filed with

the BOP.  However, ¶¶291 through 297 raises a claim of negligence with respect to the non-federal,

EMSA defendants listed in Count 1.  The "federal defendants" somehow confuse this group of

employees with themselves when they argue that Lyons cannot maintain a negligence claim against

federal employees for acts within the scope of their employment.  Lyons did not contend that these

4:03 CV 1620                                    30

defendants Brandly, Blankenship, Buford, or Dr. Spagna were federal employees.  The "federal defendants" appear themselves to be uncertain of their identities, but as explained earlier in this report, it is clear that this motion for summary judgment is directed only at the second, sixth and seventh counts of the amended complaint.


*Federal Tort Claims Act:*

The "federal defendants" argument raising the Federal Tort Claims Act is baffling.  Lyons is to say the least upset with the government's citation to *RMI Titanium Co. v. Westinghouse Elec. Corp.,* 78 F.3d 1125, 1142 (6th Cir. 1996), for the proposition that Lyons cannot maintain a negligence claim against federal employees  for acts within the scope of their employment.  That argument, though, is erroneously made in connection with allegations in the amended complaint concerning Count 1 (Amended Complaint ¶¶ 291-97).  There is no question that the FTCA is the exclusive remedy for personal injuries resulting from the performance of medical related functions by a federally commissioned public health service officer acting within the scope of his or her office. See 42 U.S.C. §233(a);  *Cuoco v. Moritsugu*, 222 F.3d 99, 107 (2nd Cir. 2000); *Navarrete v. Vanyur*, 110 F.Supp.2d 605 (N.D. Ohio 2000). The "federal defendants'" argument could be actualized with certification by the Attorney General under 28 U.S.C. §2679(d)(1), which could potentially preclude Lyons' *Bivens*-based Eighth Amendment claims. However as the case now stands, there has been no such certification, and each of the "federal respondents" was presumably either not eligible or not acting within the scope of his or her office, so each one is legally answerable to Lyons as an individual, and not as an agent of the United States.

4:03 CV 1620                                      31

The "federal defendants" next maintain that Lyons has raised FTCA claims in the amended complaint, for which the United States should be substituted as defendant.  This argument refers to Lyons' companion case, 4:03 CV 244, where Lyons has filed an amended complaint which does raise a cause of action against the United States under the FTCA (Memorandum p. 5).  The amended complaint in this matter contains no such allegations.

The "federal defendants" next infer a claim under the FTCA arguing that since Lyons has identified officials at FCI Elkton as providing him with medical care – "[t]herefore, Lyons filed suit under FTCA against these federal employees."  (Memo p. 9).  The undersigned can find no logical nexus to support this inference.  The "federal defendants'" motion incorporating their memorandum in support is only directed toward the amended complaint (ECF #6).  See Memorandum, p. 1, 2, 9, ECF #187-2.    Since the "federal defendants'" argument is premised on a misreading of the amended complaint, and since their motion for summary judgment addresses only the amended complaint (ECF #6), the court should reject this attempt to inject a phantom claim into the amended complaint. [8]

### CONCLUSION AND RECOMMENDATION

For the foregoing reasons the "federal defendants'" motion for summary judgment should be granted with respect to only the second, sixth and seventh counts of the amended complaint (ECF #6).  As a result judgment should be entered in favor of defendants (Count II) Janet Bunts, Shirley

---

[8] It is strange, though, that the "federal defendants" would gloss over the fact that Lyons filed two supplemental complaints asserting claims under the FTCA (See Joinder of Claims and Persons, ECF #25, 44, Supplemental Complaint, ECF #43).

4:03 CV 1620                                             32

Deeds, Daniel Hall, Moheb Sidhom, Dr. Ross Quinn, Dr. John Manenti, Mohammed Azam, Warden

John LaManna, (Count VI) Chris Williams, Chief Medical Officer Goforth, L. Smith, E. Barby,

(Count VII) Dr. Ellen Blair, Brian Jett, Bob Ellis, Don Mary Ellis and Warden Arthur F. Beeler, in

both their individual and official capacities. These "federal defendants" have prevailed on their

assertion of qualified immunity against Lyons' *Bivens* claims premised on Eighth Amendment

violations relating to medical care, and they should be dismissed.  This judgment, though, has no

bearing on the remaining counts of the amended complaint (ECF #6) nor any of Lyons'

supplemental pleadings.

                                    s/James S. Gallas
                              United States Magistrate Judge

       *ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of

Court within ten (10) days of mailing of this notice.  Failure to file objections within the specified

time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See*, *United States v.

Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).


Dated: September 26, 2007