UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **JAMES D. LYONS**, | ) | Case No. 4:03 CV 1620 |
| | ) | |
| Plaintiff, | ) | Judge Peter C. Economus |
| | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| | ) | |
| **SUZANNE BRANDLY**, et al., | ) | (Regarding Docket No. 229, 239) |
| | ) | |
| Defendants. | ) | Magistrate Judge James S. Gallas |
| | ) | |

James D. Lyons until recently was a prisoner in federal custody who suffers from a severe urological condition.  The allegations in his *pro se* amended complaint (ECF # 6) and supplemental complaint (ECF # 43) involve the central thesis that medical omissions and mistreatment, including the failure to promptly provide necessary corrective urological surgery, caused harm which progressed to the point that simple urethroplasty was no longer an option, and Lyons' urological condition, which he alleges was initially easily treatable,  deteriorated despite medical resources which should have been readily available including the provision of catheters and timely consultative examinations. Lyons complains that incompetent medical care resulted in erectile dysfunction and permanently painful urination difficulty. Lyons' theories of recovery include state-law claims for negligence and malpractice, violations of his Eighth Amendment Federal Constitutional rights raised in a *Bivens*-type claim [1] and claims of negligence by federal employees under the Federal Tort Claims Act (FTCA).

---

[1] See *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

2

This case has undergone protracted and convoluted piecemeal disposition, so it becomes necessary to review its current status. The complaint at issue consists of the September 4, 2003 amended complaint (ECF #6), and  the March 30, 2004 supplemental complaint. (See ECF # 43).

The amended complaint consisted of seven counts. Most recently, the second, sixth and seventh counts were dismissed (ECF # 219, 225). [2]  The third count concerning Dr. Bradford Black was dismissed on April 19, 2005. (ECF # 108, 112).  The fourth count concerning Maria Marrero, Michael Growse, Gerry Payne and Warden Maryllen Thoms was dismissed on September 30, 2005, and through that same order the fifth count concerning Dr Ray was transferred to the Eastern District of Kentucky. (ECF # 130). Still pending are the first count of the amended complaint alleging negligence by medical personnel at Franklin County Correctional Center 1 ("FCCC1") concerning Suzanne Brandly, Enid Blankenship, Dr. Spagna, R. Burford and EMSA Correctional Care, a corporate entity. There is also the matter of the supplemental complaint allegations of deliberate indifference contrary to the Eighth Amendment and negligence under the Federal Tort Claims Act against Drs. Quinn and Manenti, Health Services Administrator Mohammed Azam, Associate Warden Brian Hertel, Warden Mark A. Bezy, Regional Director Mickey E. Ray, David Hicks from the Office of Medical Designations and Transportation, and Harley G. Lappin, Director of the Federal Bureau of Prisons,  who are alleged to have either treated Lyons at FCI Elkton or involved in decision-making on the place he was to receive treatment. (ECF # 43).

---

[2]  The defendants in **Count II** -- Janet Bunts; Shirley Deeds; Daniel Hall; Moheb Sidhom; Dr. Ross Quinn; Dr. John Manenti; Mohammed Azam; Warden John LaManna; in **Count VI** –  Chris Williams; Chief Medical Officer Goforth; L. Smith; E. Barby; in **Count VII** –  Dr. Ellen Blair; Brian Jett; Bob Ellis;  Mary Ellis and Warden Arthur F. Beeler.

4:03 CV 1620                                          3

On July 7, 2008, Lyons moved for summary judgement arguing that "Summary Judgment is appropriate in this matter in regards to Count 1 of Lyons' complaint and his FTCA negligence claims direct at defendant United States as stated in Lyons' supplemental complaint. (footnotes omitted)." (ECF # 229).  The United States on August 13, 2008 filed its notice of substitution for all federal defendants except EMSA Correctional Care and Dr. Black, followed by its amended notice of substitution of the United States for all federal defendants which additionally excepted all the defendants identified in the first count of the amended complaint. ( ECF # 235, 238).  On August 21, 2008, defendants moved for summary judgment (ECF # 239). The parties have now responded to the cross-motions for summary judgement.


*Standard of review:*

Under Rule 56 of the Federal Rules of Civil Procedure granting a motion for summary judgment is only proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  In determining whether there is a genuine issue of material fact all inferences drawn from the underlying facts contained in affidavits, pleadings, responses to discovery requests, and depositions must be viewed in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).  A court must inquire "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  The court may not make credibility determinations or weigh the evidence when ruling on

4:03 CV 1620                                    4

a motion for summary judgment. *Anderson*, 477 U.S. at 255. The burden is upon the movant to demonstrate the absence of a genuine issue of material fact. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir. 1979), *cert. dismissed* 444 U.S. 986 (1979). However, the nonmoving party is obliged to produce some evidence other than mere pleadings themselves to demonstrate that there is a genuine issue for trial. *Celotex Corporation v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party must produce significant probative evidence in support of the complaint to defeat the motion for summary judgment through affidavits or admissions on file. *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 339-40 (6th Cir. 1993). In the final analysis, "the threshold inquiry . . . [is] whether there is a need for trial -- whether in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250; *Moore*, 8 F.3d at 340. Once the nonmoving party has responded , the court must view the facts in the light most favorable to the nonmoving party. *Darrah v. City of Oak Park,* 255 F.3d 301, 304 n.1 (6th Cir. 2001).

*Summary Judgment should be entered on First Count of Amended Complaint (ECF # 6):*

The first count of the amended complaint asserts a state law based claim of negligence, hence, medical malpractice against Suzanne Brandly, Enid Blankenship, Dr. Spagna, R. Burford and EMSA Correctional Care. These individuals were employees of EMSA Correctional Care, which had contracted with Franklin County to provided medical care services at FCCC1.[3] Lyons identifies

---

[3] The "federal defendants" argue against liability under the FTCA for these defendants. (See ECF # 239, 241). Lyons is not raising FTCA- related claims with respect to the "EMSA defendants." Lyons responds that these are "diversity claims." The first count is more correctly read as a state law claim over which this court is exercising its

them collectively as the "EMSA defendants."    Lyons admits that he had a urethral stricture condition since 1995, due to a congenitally narrow urethra after he passed a kidney stone.  At that time he was receiving treatment from Dr. Schissel and urologist Dr. Conrad. He was prescribed a meatal dilator to keep the urethra open. On August 19, 1998 Lyons was taken into federal custody and as a pretrial detainee he was housed at FCCC1. His dilator was confiscated  by EMSA defendants although they were aware of Lyons' medical needs. Lyons further claims that the EMSA defendants were aware that he was dilating with a piece of plastic but was not urologically examined until October 21, 1998, and a referral was made for a urological examination by Dr. Kaufman on November 19, 1998.  Surgery was performed and intermittent self-catheterization was prescribed. Lyons complains that he was never provided with patient education and demonstration of self-catheterization and he was required to re-use catheters while at FCCC1. He asserts that his suffering is charted in his medical records.

*Lack of a medical expert is fatal to First Count's allegations against individuals:*

Lyons must establish medical malpractice, rather than mere negligence, under the first count of the amended complaint to sustain an action against medical personnel.  See *Sloan v. Ohio Dept. of Rehab. & Corr.*, 119 Ohio App.3d 331, 334, 695 N.E.2d 298 (1997); *Promen v. Ward*, 70 Ohio App.3d 560, 565, 591 N.E.2d 813 (1990). The applicable state standard is from *Bruni v. Tatsumi*, 46 Ohio St.2d 127 (1976), which sets out the medical malpractice standard  in the state of Ohio:

> In order to maintain a cause of action in medical malpractice, three elements must be proved.  Plaintiff must establish the applicable standard of care,

supplemental jurisdiction under 28 U.S.C. 1367.

usually through expert testimony, show a negligent failure on the part of the
defendant to render treatment in conformity with the standard of care; and
demonstrate that the resulting injury was proximately caused by defendant's
negligence.

*Ulmer v. Ackerman*, 87 Ohio App.3d 137, 140, 621 N.E.2d 1315, 1317 (1993)(citing *Bruni
v. Tatsumi*, 46 Ohio St.2d 127, 131-32, 77 O.O.2d 184, 346 N.E.2d 673 (1976)).

Expert testimony is a necessary component to establish that the ". . .chain of circumstances
and events from which an inference may reasonably arise that the physician was negligent and that
such negligence was the proximate cause of an impaired physical condition." *Buerger v. Ohio Dept.
of Rehab. & Corr.*, 64 Ohio App.3d 394, 400, 581 N.E.2d 1114 (1989). The same general standard
also applies to medical malpractice claims brought by prisoners. *Buerger*, 64 Ohio App.3d at 397-
98, 581 N.E.2d 1114 (1989). Complaints of persistent pain subsequent to medical care are
insufficient to establish an inference of medical malpractice to circumvent the necessity of evidence
from an expert. See *Buerger*, 64 Ohio App.3d at 400.

In prior orders the court has informed Lyons of this standard and Lyons acknowledges it in
his motion for summary judgment. His new argument is that this malpractice standard only applies
to licensed professionals and that the medical licensing of the EMSA defendants is unknown.
However, in his amended complaint, Lyons did identify  Dr Spagna as a licensed physician (¶ 9))
and the remaining staff as registered nurses (¶¶ 7-8, 10). Lyons' admissions have established these
defendants to be licensed professionals.

4:03 CV 1620                                    7

Lyons also has refined his argument to acknowledge the more limited duties of the nursing profession which " include a duty to keep the attending physician informed of a patient's condition so as to permit the physician to make a proper diagnosis of and devise a plan of treatment for the patient." *Berdyck v. Shinde,* 66 Ohio St.3d 573, 580, 613 N.E.2d 1014, 1022 (1993), quoting *Albain v. Flower Hosp.*, 50 Ohio St.3d 251, 265, 553 N.E.2d 1038, 1051 (1990). However, evidence from a medical expert is still generally required when the alleged negligence involved professional skill and judgment as the performance of "competent nursing assessment of the patients's condition according to the standards of conduct required of a nurse practitioner." *Id.*, 66 Ohio St.3d at 581-82, 613 N.E.2d at 1022-23 (citing *Ramage v. Cent. Ohio Emergency Serv., Inc.* 64 Ohio St.3d 97, 592 N.E.2d 828 (1992)(syllabus ¶ 1)).

Lyons attempts to overcome his evidentiary shortfall with a plea for the court to take judicial notice of his medical records. Again, conformity with  the standard of reasonable  medical care is at issue and the medical records do not provide this evidence. His allegations concern a complex series of medical treatments and a medical expert is necessary to support Lyons' allegation of medical malpractice.

Lyons  claims to have evidence from an expert on the standard of care through Ex. F to his motion, purported excerpts from discovery responses from Dr. Black.  These responses do not provide medical opinion establishing a breach of the standard of care or aggravation of Lyons' congenital condition due to medical practice. Granted Lyons has a painful condition and that self-dilation is painful, as evidenced in the purported excerpts. Again though, persistent pain subsequent

4:03 CV 1620                                      8

to medical care is insufficient to establish an inference of medical malpractice. See  *Buerger*, 64

Ohio App.3d at 400.  In any event, the excerpts are not signed to authenticate them and the original

discovery responses are not presented as an alternate source of identification. See Fed R. Civ. P.

33(b)(5), 36(a)(3)( interrogatories and admissions must be signed).


Nor are the other exhibits sufficient to establish the standard of care, breach and the

necessary nexus. Borrowing from the satellite litigation involving Dr. Ray:

> The plaintiff has provided evidence that there are alternative, less conservative
> treatments for urethral stricture. He has also provided evidence that the conservative
> treatment failed. However, the plaintiff has not provided credible evidence that,
> under the circumstances, the defendant's choice of the conservative treatment
> violated the standard of care. Therefore, summary judgment is appropriate on
> Plaintiff's negligence claims.

*Lyons v. Ray*  2007 WL 1309679, 2 (E.D. Ky.).


Lyons finally seeks to circumvent the need of evidence from a medical expert under Ohio's

"common knowledge exception" to the general rule requiring expert opinion. See *Buerger*, at 400-

01. Common knowledge may apply in matters of gross inattention to obvious situations.  *Buerger*,

64 Ohio App.3d at 399;  *Jones v. Hawkes Hosp. of Mt. Carmel*, 175 Ohio St. 503, 196 N.E.2d 592,

26 Ohio Op.2d 170 (1964) (unattended unrestrained delirious pregnant woman who had attempted

to climb from her bed several times); *Wharton v. Long*, 18 Ohio L.Abs. 147 (App. 1934) (failure to

attend to child who was vomiting blood and had high fever after surgery).   However, this exception

does not apply in  matters involving diagnosis and treatment.  *Buerger*, at 400; *Whiteleather v.

Yosowitz*, 10 Ohio App.3d 272, 275, 461 N.E.2d. 1331 (1983). Lyons maintains that his self-

catheterization matters are within a layperson's realm of understanding. He argues that he did not receive instruction, two catheters were provided for indefinite re-use contrary to manufacturer's recommendation and insufficient lubricant was provided. (Motion p. 5, ECF # 229). Since he had been dilating his constricture since 1995, Lyons has not demonstrated that he could not ascertain how to use the plastic tubing provided.  Manufacturer's recommendations do not establish reasonable medical care, and Lyons admits that he was given lubricant. None of these arguments fall within the gross neglect envisioned under Ohio's common knowledge exception.

"Failure to establish the recognized standards of the medical community has been fatal to the presentation of a *prima facie* case of malpractice by the plaintiff[ ]." *Bruni* at 131; *Buerger*, at 398.  Failure to produce expert evidence on the standard of care and proof that the injury was proximately caused by the failure of the physician to adhere to the standard of care  results in dismissal. *Buerger* at 398; *Bruni*, at 131-32.  The lack of evidence from a medical expert is fatal to Lyons' malpractice claims against the individual defendants identified in the first count.

Further, Lyons has not demonstrated "direct, personal , and proximate supervision" over the nurses for the physicians to share vicarious liability. Compare *Ferguson v. Dyer*, 149 Ohio App. 3d 380, 385-86, 777 N.E. 2d 350 (2002).

*Lack of a medical expert is fatal to First Count's allegations against EMSA Correctional Care:*

The relationship between EMSA Correctional Care and its employees is analogous to that of a hospital and its staff.  While a hospital does not practice medicine and thus cannot commit

malpractice, it can be held responsible under derivative liability. See *Berdyck*, 66 Ohio St.3d at 578, 613 N.E.2d at 1020; *Browning v. Burt*, 66 Ohio St. 3d 544, 556, 613 N.E. 2d 993, 1003 (1993)(citing *Lombard v. Good Samaritan Med*. Ctr. 69 Ohio St. 2d 471, 433 N.E. 2d 162 (1982)); *Comer v. Risko*, 106 Ohio St. 3d 185, 833 N.E.2d 712 (2005).  EMSA Correctional Care has potential *secondary* liability under the state doctrine of *respondeat superior* for the undirected negligent act of its physician employees.  See *Comer v. Risko*, 106 Ohio St. 3d 185, 833 N.E.2d 712 (2005); *Stephenson v. Upper Valley Family Care, Inc*.  2008 WL 2404076, 8 (Ohio App. 2 Dist.). "However, once the primary liability is extinguished, the secondary liability is necessarily extinguished as well" *Radcliffe v. Mercy Hosp. Anderson*, 1997 WL 249436 (Ohio App. 1 Dist.)(citing *Losito v. Kruse*, 136 Ohio St. 183, 187, 24 N.E. 2d 705, 707 (1940)); and see *Comer*, 106 Ohio St. 3d at 189, 833 N.E. 2d at 717 (citing *Losito* and *Radcliffe*).

On the other hand, EMSA Correctional Care as the employer of its nursing staff has *primary* liability. "All nurses are shielded form primary liability in medical malpractice actions because they are subject to the control of the greater entity." *Doros v. Marymount Hosp., Inc.,*  2007 WL 764728, 4 (Ohio App. 8 Dist.). But again, this liability hinges on the standard of conduct required by the nurse. See *Berdyck*, 66 Ohio St.3d at 578-80, 613 N.E.2d at 1020-21. EMSA Correctional Care cannot be held primarily responsible when Lyons has failed to demonstrate through evidence from a medical expert that the nursing care he received was negligently inadequate. Consequently,

4:03 CV 1620                                  11

summary judgment should be entered in favor of all "EMSA defendants" on the first count of the amended complaint.[4]


Summary judgment should be entered to dismiss the first count of the amended complaint despite the lack of opposition from the "EMSA defendants." Opposition to Lyons' motion for summary judgment exists only from the "federal defendants." (See ECF #241), and the cross-motion for summary judgement is also by the "federal defendants (See ECF # 239). The "EMSA defendants" do not oppose summary judgement. Summary judgment, though, is not to be equated with default judgment when a motion is unopposed. Rule 56 requires a court, even where the motion is unopposed, to determine when the moving party has established a right to relief as a matter of law and that no genuine issue of material fact exists before the court may enter summary judgment. *Donlin v. Watkins*, 814 F.2d 273, 277 (6th Cir. 1987); *Kendall v. Hoover Co.*, 751 F.2d 171, 173-74 (6th Cir. 1974). Due to the lack of medical expert opinion on the standard of care, there is no genuine issue of material fact remaining and summary judgement should be entered against Lyons on his own motion.


*Summary Judgment should be entered in favor of the United States on the Supplemental Complaint (ECF # 43):*

*Nature of Claims in Supplemental Complaint:*

---

[4] The "federal defendants" move to dismiss on the basis of timeliness under 28 U.S.C. 2401(b) or Ohio Rev. Code 2305.11(A). (See ECF #241). However, this affirmative defense was not raised in the answers. See Fed. R. Civ. P. 8(c)(1).

4:03 CV 1620                                    12

Lyons maintains in his supplemental complaint that defendants failed to transfer him to a facility which would adequately address his medical needs, failed to prevent the internal collapse of the January 2003 perineal urethrostomy (which led to the December re-operation), knowingly withheld or delayed medical treatment, and failed to adequately and responsibly delegate and monitor the medical contractors.(ECF # 43 ¶ 21). The supplemental complaint is a composite pleading which incorporates by reference Lyons's previous motion for emergency temporary restraining order ¶¶ 1-54 (ECF # 11) and Lyons's "joinder of claims and persons" (ECF # 25).  In this "joinder" document Lyons stated his intent to sue defendants in both their individual and official capacities under the FTCA and the Eighth Amendment and that the United States Of America was added as a defendant since actions against federal officials in their official capacities are construed as actions against the United States. (Recently, substitution of the United States has  come to pass.)

The alleged facts in the supplemental complaint are few.  However, through incorporation from the emergency motion (ECF # 11), the gist of these allegations is failure of defendants to provide adequate medical attention and alleged deliberate indifference to Lyons' serious medical needs  (Motion ¶ 47, ECF # 11).

*Parties to the Supplemental Complaint:*

Lyons' procedural treatment of his former medical providers, though, is rather casual. The supplemental complaint document itself bears no caption. A reasonable construction of the supplemental complaint document and its incorporation of the emergency  motion  is that it was

4:03 CV 1620                                           13

Lyons' intent only to state supplemental claims against those individuals listed in the motion for emergency temporary restraining order's caption and as described within.  In the emergency motion caption (ECF # 11) Lyons identified Drs. Quinn and Manenti, Health Services Administrator Mohammed Azam, Associate Warden Brian Hertel, Warden Mark A. Bezy, Regional Director Mickey E. Ray, David Hicks from the Office of Medical Designations and Transportation, and Harley G. Lappin, Director of the Federal Bureau of Prisons.  Paragraphs 4 through 16 in the emergency motion identify and describe the work performed by each party listed in the motion's caption under the heading "Parties."  Some  defendants included in the amended complaint (ECF # 6), as Dr. Blair, Bob Ellis, Mary Ellis, and Arthur Beeler, are not included under the heading "Parties,"  but are  included  within those paragraphs bearing the heading "Statement of Facts." Further, in the body of the supplemental complaint, it echoes a list of these defendants associated with the emergency motion ( ECF #43 ¶¶ 21,23).  The reasonable construction of the document is that only the legality of the actions of  Drs. Quinn and Manenti, Health Services Administrator Mohammed Azam, Associate Warden Brian Hertel, Warden Mark A. Bezy, Regional Director Mickey E. Ray, David Hicks, and Harley G. Lappin are challenged in the supplemental complaint. [5]

*Overview Of Events:*

---

[5]  Note: Lyons'  proof of service  indicates service on Hertel, Bezy, Hicks and Lappin, although they were not identified as parties in the amended complaint. (ECF # 22).

4:03 CV 1620                                     14

The time period in issue in the supplemental complaint, as incorporated through the emergency motion (ECF # 11) concerns the period following Lyons' transfer to the Federal Medical Facility in Butner, North Carolina, (" FMC-Butner") for specialized medical treatment of his urological condition, his return to FCI-Elkton, where he was unsuccessfully treated, and transfer to FMC-Butner for reconstructive urethrostomy in December 2003.  He includes the statement of uncontested facts from the prior summary judgement proceeding (ECF # 219, 229-8, 247-4), which are reduced in scope since the events in the emergency motion, hence supplemental complaint commence with Dr. Peterson's treatment while Lyons was housed at FMC-Butner:

106.   Lyons experienced additional bladder retention on 5/11/2002 & 7/10/2002 that required catheterization by FMC BUH Medical Staff due to Lyons' inability to ISC;

107.   On 7/26/2002, Lyons was seen by Dr. Murphy (DUMC) who urologically examined Lyons to include catheterizing Lyons.  In order to resolve Lyons' problems with ISC, Dr. Murphy recommended a meatal dilator, coude catheters and a lubricant injection method to aid in Lyons' ISC.  An actual instruction sheet was prepared to take back to FMC BUH.  Dr. Murphy stated in his MR: "Patient previously seen by Dr. Bruno last October [2001] - never had any workup completed for issues that are beyond my capabilities to understand".  Dr. Murphy recommended a RUG to assess the extent of the stricture disease; see DUMC MRs, Exh. F;

108.   On 8/20/2002, DUMC performed a RUG on Lyons that indicated "severe stricturing and linear calcification throughout the course of the distal half of the penile urethra"; Exh. F;

109.   On 9/12/2002, Lyons was seen by Dr. Blair who noted his ISC problems;

110.   On 9/18/2002, Dr. Webster (DUMC) diagnosed Lyons' urethral stricture as "obliterative pendulous urethral stricture".  Dr. Webster's treatment recommendations included multi-stage urethroplasty, perineal urethrostomy (urinary tract by-pass) and continued ISC (until complete failure); Exh. F;

4:03 CV 1620                                          15

111.    After 9/18/2002 until 11/21/2002, Lyons was required to continue to
        ISC (4-6 times/day) with a #10 Fr. coude catheter since the FMC
        BUH Federal Defendants would not approve alternative urological
        treatment.

112.    On 11/21/2002, Lyons developed stricture impassability and major
        bladder retention (>1L) in which the FMC BUH Medical Staff was
        unable to catheterize Lyons that required the placement of a
        suprapubic catheter at DUMC;

113.    On 11/22/2002, the FMC BUH Federal Defendants stated that they
        would not approve any urethroplasty procedure for Lyons, but would
        allow the perineal urethrostomy;

114.    On January 2, 2003, with the BOP's surgical approval, Drs. Peterson
        & Webster, performed a perineal urethrostomy on Lyons at DUMC;

115.    As a result of Lyons' perineal urethrostomy, Lyons is now required
        to sit down to void.  Lyons' urinary tract is now severed at the
        perineum (at by-pass point), Lyons' pendulous penile urethra is now
        scarred shut and Lyons is incapable of conventional procreation;

116.    After the 1/2/2003 perineal urethrostomy, Lyons required wound care
        and urological follow-up at DUMC;

117.    As a result of a urethral tissue biopsy taken on 1/2/2003, Lyons was
        informed by Dr. Peterson (DUMC) that lichen sclerosis (BXO) was
        present in Lyons' urethral stricture scar tissue.

118.    On 2/4/2003, Dr. Blair prepared a Medical Transfer Summary (later
        dated 2/24/2003) that stated that Lyons was healed from the
        1/2/2003, no further treatment was needed and Lyons could be
        transferred back to regular facility since medical treatment was
        completed.  Dr. Blair's medical summary was incorporated into the
        EMS-413.060 (dated 2/26/2003).  See BOP Summaries, Exh. E;

119.    On 3/21/2003, Lyons had a follow-up evaluation by Dr. Peterson who
        stated that in regards to Lyons' wound, Lyons was healing well, but
        not fully healed (". . . small amount of granulation tissue on the left
        side where the wound had opened prior.") Exh. F;

120.    In March 2003, Dr. Ray provided sworn statements to the Kentucky
        Medical Board regarding Lyons' complaints in 2001;

121.    On 4/1/2003, Lyons was placed "in-transit" by the FMC BUH Federal Defendants without any wound care instructions in Lyons' transit orders;

122.    During 4/1/2003 through 7/2/2003, Lyons was in at least four different transfer facilities.  The limited BOP MRs from during this time period do not document any wound care being provided to Lyons;

123.    On 7/2/2003, Lyons arrived back at FCI ELK and informed the FCI ELK Medical Staff of his changed urological system (perineal urethrostomy) and increased difficulty in urination;

124.    Lyons was treated for a UTI in late July 2003;

125.    On 8/19/2003, Dr. Quinn became aware of Lyons' increased difficulty in urinating through the perineal urethrostomy and attempted to catheterize Lyons, which failed;

126.    On 8/2/2003, Lyons was hospitalized at Saint Elizabeth's Hospital (Youngstown, OH) due to Lyons' bladder retention and increased difficulty in urination;

127.    On 8/22/2003, Lyons required an emergency surgery (placement of a suprapubic catheter, #12 Fr. by Dr. David Pichette (urologist) due to the "internal collapse: of the perineal urethrostomy;

128.    Dr. Pichette provided standard catheter care recommendations for Lyons' suprapubic catheter to include: upgrading the size to #16 Fr. within a month and catheter irrigations of dilute vinegar/saline solutions to keep the suprapubic catheter clean;

129.    The FCI ELK medical staff did not perform the suprapubic catheter care instructions as recommended by Dr. Pichette until after 9/13/2003 and required Lyons to perform his own wound care and dressing changes in his prison housing unit;

130.    On 9/12/2003, Lyons developed a serious UTI (borderline urosepsis) with a fever that required treatment with antibiotics;

131.    On 9/13/2003, the FCI ELK Medical Staff began daily irrigation of Lyons' suprapubic catheter, but did not change Lyons' suprapubic catheter;

4:03 CV 1620                                    17

132.    In October 2003, a medical transfer request (dated 10/8/2003) was prepared by the FCI ELK Defendants (Azam, Quinn, Manenti, AW Hertel and Warden Bezy);

133.    On 10/16/2003, Lyons' suprapubic catheter failed requiring Lyons to be taken to Saint Elizabeth's ER again to have another suprapubic emplaced.  The ER physician was only able to emplace a smaller #10 Fr. suprapubic catheter without any mounting fixtures.  Urological follow-up was recommended to upgrade the catheter.

134.    After the 10/16/2003 suprapubic catheter emplacement, Lyons was not seen by any urologist until after his transfer back to FMC BUH;

135.    On 11/4/2003, Lyons was transferred back to FMC BUH by special air charter by order of the FCI ELK Defendants (Azam, Quinn, Manenti, AW Hertel and Warden Bezy);

136.    During 7/2/2003 through 11/4/2003, Lyons never saw Dr. Black;

137.    On 11/21/2003, Lyons was seen by Dr. Tash (DUMC) who replaced the suprapubic catheter and recommended re-operation of Lyons' failed perineal urethrostomy.

138.    On 12/15/2003, Lyons had a surgical revision performed on his perineal urethrostomy by Drs. Tash and Webster at DUMC;

139.    On 1/7/2004, Lyons had a post-operative visit with Dr. Tash who removed the emplaced foley catheter and gave Lyons instructions for post-operative ISC of the perineal urethrostomy to maintain urethral patency.  The post-operative ISC instructions included patient education and demonstration thereof; See DUMC MRs, Exh. F;

140.    On 1/8/2004, the FMC BUH Medical Staff (Drs. Blair & Bonner, HSA B. Ellis, DON M. Ellis, PA Spiller, RN Hollis & Mr. Livingston) held a meeting with Lyons to implement the post-operative ISC recommendations by DUMC of the perineal urethrostomy to be conducted at Health Services;

141.    On 2/18/2004, Lyons had a follow-up visit with Dr. Tash who recommended maintaining the ISC to prevent recurrence of the urethral strictures.  Dr. Tash stated in part: ". . . I am going to keep him on this [ISC] because I do not want any recurrence of his stricture disease and then given the fact that he has suboptimal care

in his living facility I think the better part is to continue with calibration once weekly . . ."; See Exh. F;

142.  On 5/21/2004, Lyons had his last follow-up visit with Dr. Tash.  Dr. Tash noted that although the perineal urethrostomy was an effective short-term remedy, only a two-stage repair would allow Lyons the option to have children as she had stated previously in her 4/17/2004 letter ("natural impregnation cannot happen through the perineal urethrostomy").  Dr. Tash noted Lyons' ED complaints and penile scarring, and stated that a referral to see the Dr. Donatucci (DUMC ED Specialist) was required; See Exh. F;

143.  On 2/18/2005, Lyons had a follow-up visit with Dr. Sherman (DUMC).  Dr. Sherman recommended that Lyons should continue the perineal ISC and his physical exam noted Lyons' Right-side Penile Shaft Plaques, and that follow-up for Lyons' ED complaints would need to be done by erectile dysfunction specialists; See Exh. F;

144.  Lyons' ED complaint has never been evaluated despite his numerous complaints.

145.  Lyons' urethral stricture condition has deteriorated over his incarceration from 1998 through 2007;

146.  Lyons has suffered a number of urological complications as a result of urological treatment and procedures to include UTIs, hospitalizations, operations, abscesses, and other infections;

147.  Definitive urological treatment for Lyons' urethral stricture was never provided by the Federal Defendants to include the BOP and United States;

148.  The BOP's "Conservative Treatment" of prolonged ISC failed;

149.  Lyons requires medical (urological) treatment in the form of a two-stage repair (multi-stage urethroplasty) to restore and provide definitive treatment of his urethral stricture.

However, Lyons now provided an  extensive "continuance" of his prior uncontested facts numbered from 150 through 2791. (See ECF # 229-9, 247-4). These present a great deal of overlap and  state blatant legal conclusions. Lyons has failed to produce a convincing reason to supplant his

arguments with this additional set of redundant "uncontested facts." However, Lyons has also included two affidavits, which are considered to the extent their assertions are based on personal knowledge. See Fed. R. Civ. P. 56(e)(1); *Celotex Corp*., 477 U.S. at 322 n. 3, 106 S.Ct. at 2552 n.3.

        The relevant statements to the supplemental complaint in Lyons' affidavits (ECF # 229-4) focus upon his January 2, 2003 perineal urethrostomy performed by Drs. Webster and Peterson at Duke University Medical Center (DUMC) while Lyons was housed at FMC-Butner and its subsequent collapse while Lyons was housed at FCI-Elkton.  Lyons states in his affidavit that following a consultation with Dr. Peterson on September 18, 2002, he was told he had four options: continued self-catheterization; suprapubic catheter; two-stage graft repair (complex urethroplasty); or, perineal urethrostomy (Aff. ¶1819).  On December 18, 2002, Dr. Peterson informed Lyons that perineal urethrostomy was the  only surgical option approved by the Bureau of Prisons, and Lyons "reluctantly" agreed (¶ 1948, 1971-1977).  The operation was performed and Lyons states that he experienced significant post-operative bleeding and was seen by Dr. Ellen Blair at FMC-Butner of post-operative examination on January 16, 2003.  Despite Lyons' complaints of pain and bleeding, Dr Blair opined that Lyons was sufficiently stable for transfer to a non-medical institution and did not need an additional follow-up at the Duke University Medical Center. (¶ 1995-2001). On January 22, 2003, Dr. Bonner examined the surgical site and agreed that Lyons had healed sufficiently for immediate transfer despite Lyons' complaints (¶ 2002-2008, 2014). On February 26, 2003, Warden Beeler approved Dr. Blair's medical discharge summary and forwarded the EMS-413.060 form to the Bureau of Prisons. The following day, Dr. Blair consented to a post-operative followup by Dr. Peterson. (¶ 2036).  Dr. Peterson stated on March 21, 2003, that full internal healing could take

another month and prescribed "Detrol" for bladder incontinence. (¶ 2039-2046, 2065). Lyons was

again seen by Dr. Blair on March 25, 2003,  who substituted a generic medication and told Lyons

he was to be transferred no matter what his medical condition despite Lyons complaints that he was

not fully healed. Lyons was transferred on April 1, 2003, and states that he received inadequate

medical care at transfer facilities of FCI-Petersburg, FDC- Philadelphia, and MDC-Brooklyn.(¶

2085-2167). Lyons arrived back a t FCI-Elkton on July 2, 2003, where Lyons was again dissatisfied

with the medical care he received.  The perineal urethrostomy collapsed, a suprapubic catheter was

emplaced to provide an outlet for urine,  and by October 16, 2003, the suprapubic catheter failed

with painful urine leakage into his abdomen after he had complained to Dr. Quinn and HSA Azam

that a suprapubic catheter upgrade was overdue. (¶ 2320-2350). On October 16, 2003 HSA Azam

and Dr. Manenti approved transport to St. Elizabeth's Hospital's emergency room. (¶ 2351-2357).

A replacement catheter was inserted but the emergency room physician recommended upgrade to

a larger catheter more secure catheter at the Cleveland Clinic. Lyons was returned to FCI-Elkton that

day and on October 17, 2003, Dr. Quinn examined Lyons and observed that the suprapubic catheter

was held in place only by tape and gauze bandages, and Dr. Quinn applied more glue. (¶2363-2369).

Dr. Quinn told Lyons that he would speak to HSA Azam and Dr. Manenti about urological consults.

(¶2382). Cleveland Clinic was never contacted and from October 17, 2003, Lyons continued to

experience pain at the catheter incision site. On November 4, 2003,  Lyons was transferred by

special air charter to FMC-Butner (¶2393-2396). Lyons was seen by Dr. Blair and he reminded that

doctor that he had spoken before about the lack of basic medical resources at FCI-Elkton and that

imprisonment there would cause him harm and he "thanked" the doctor "for all the harm, pain, and

suffering" that he had been through.  (¶2412-13).

4:03 CV 1620                                    21

*Bivens-based claims- Official Capacity:*

The allegations of action in the official capacity under these *Bivens*-based claims must be dismissed as a matter of law.  Lyons  holds the "federal defendants"  responsible alternatively in both their official and individual capacities (ECF # 25). The doctrine of sovereign immunity bars suits against the United States and suits for pecuniary damages against the officers and agents in their official capacities.  See *Blakely v. U.S.*, 276 F.3d 853, 870 (6th Cir. 2002);  *Ecclesiastical Order of the Ism of Am, Inc. v. Chasin*, 845 F.2d 113, 115-16 (6th Cir. 1998);  *Ashbrook v. Block*, 917 F.2d 918, 924 (6th Cir. 1990);  *Reed v. Reno*, 146 F.3d 392, 397-98 (6th Cir. 1998).  Sovereign immunity accordingly bars the claims against the federal defendants in their "official capacities" since the claims constitute an action against the United States.

*Bivens-based claims- Individual or Personal Capacity:*

The  prior report and recommendation on defendants' motion for summary judgement pointed out that a federal inmate cannot maintain a *Bivens* action against prison doctors for performance of medical, surgical, dental, or related functions when the United States is substituted. The FTCA is the sole remedy for injuries that may have been inflicted by Public Health Service Officers acting within the scope of their employment. See 42 U.S.C. §233(a);  *Navarrete v. Vanyur*, 110 F. Supp. 2d 605, 606 (N.D. Ohio 2000); and see *Lyons v. U.S.* 2008 WL 141576, 17 (N.D. Ohio

4:03 CV 1620                                22

Jan. 11, 2008) [6]; but see *Castaneda v. United States*, 546 F.3d 682 (9th Cir. 2008). The United States has been substituted on behalf of the defendants identified in the supplemental complaint remedying in part the prior barrier to the "federal defendants" argument.  However, the "federal defendants" and now the United States fail to support exclusivity.

First, as Lyons  points out, there is no support for this argument that the "federal defendants" are Public Health Service Employees.[7] Lyons  made this point in his opposition brief filed on September 23, 2008 (ECF # 247), and the United States did nothing to rectify this possible oversight in its subsequently filed papers.  Second, the supplemental complaint also accuses this set of "federal defendants" of failing to designate a proper facility for Lyons' transfer and failing to delegate and monitor the medical contractors including the Duke University Medical Center (DUMC) contractors (See Supplemental Complaint,  ECF # 43,¶ 21). [8]  These claims do not involve medical treatment.

---

[6] Previously with respect to other counts in the amended complaint, the undersigned had stated:
 There is no question that the FTCA is the exclusive remedy for personal injuries resulting from the performance of medical related functions by a federally commissioned public health service officer acting within the scope of his or her office. See 42 U.S.C. § 233(a); *Cuoco v. Moritsugu*, 222 F.3d 99, 107 (2nd Cir.2000); *Navarrete v. Vanyur*, 110 F.Supp.2d 605 (N.D.Ohio 2000). The "federal defendants' " argument could be actualized with certification by the Attorney General under 28 U.S.C. § 2679(d)(1), which could potentially preclude Lyons' *Bivens* -based Eighth Amendment claims. However as the case now stands, there has been no such certification, and each of the "federal respondents" was presumably either not eligible or not acting within the scope of his or her office, so each one is legally answerable to Lyons as an individual, and not as an agent of the United States.

*Lyons v. U.S.,* 2008 WL 141576, 17 (N.D. Ohio).

[7]  Compare *Lewis v. Sauvey*, 708 F. Supp.167, 168-69 (E.D. Mich. 1989)(Doctor by declaration stated that she was commissioned in the Public Health Service); *Cuco v. FMC-Lexington*, 2006 WL 1635668, 20 (E.D. Ky.) (Defendants each alleged by declaration that they were employed by the United States and were commissioned officers with the United States Public Health Service as PHS officers.

[8]  Note: the employees and contractors at DUMC, such as Dr. Peterson,  are not themselves parties in the supplemental complaint and they would not be shielded under §233(a), See *Cuco v. FMC-Lexington*, 2006 WL 1635668,

4:03 CV 1620                                   23

Accordingly, Lyons's supplemental complaint will proceed with the *Bivens* and FTCA claims as "parallel, complementary causes of action. See *Carlson v. Green,* 446 U.S. 14, 20 , 100 S.Ct. 1468, 1472, 64 L.Ed.2d 15 (1980).

"[T]he Eighth Amendment prohibits mistreatment only if it is tantamount to 'punishment,' and thus courts have imposed liability upon prison officials only where they are 'so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain.'" *Perez v. Oakland County,* 466 F.3d 416, 423-424 (6th Cir. 2006), *cert. denied*, 128 S.Ct. 166, 169 L.Ed.2d 33 (2007)(citing *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir.1994)); *Estelle v. Gamble*, 429 U.S. 97, 103-04, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).  Lyons' claims under the Eighth Amendment must be analyzed in light of  the  deliberate indifference standard,  set forth in *Farmer v. Brennan*, 511 U.S. 825, 114 S. Ct. 1970, 128 L.Ed.2d 811 (1994), which was itself an action against federal officials brought under *Bivens. Farmer* sets out a two-prong test with its objective and subjective components.

The objective component of the deliberate indifference test is  serious medical need.  "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Perez,* 466 F.3d at 423-424 (citing *Blackmore v. Kalamazoo County*, 390 F.3d 890, 897

---

19 (E.D. Ky.) .

4:03 CV 1620                                              24

(6th Cir.2004)).[9]  "[G]rossly inadequate care' satisfies only the objective prong of the 'deliberate

indifference' standard" under *Farmer*.  *Perez,* 466 F.3d  at 424.[10]


"The subjective component, in contrast, requires a plaintiff to 'allege facts which, if true,

would show that the official being sued subjectively perceived facts from which to infer substantial

risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk.'"

*Dominguez v. Correctional Medical Services,* -F.3d- , 2009 WL 363783, 4 (6th Cir. 2009)(quoting

*Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir.2001) (citing *Farmer*, 511 U.S. at 837, 114 S.Ct.

1970). Lyons "must still present evidence of a prison official's subjective awareness of, and

disregard for, a prisoner's serious medical needs." *Perez*, 466 F.3d at 424 ; and see *Farmer*, 511 U.S.

at 834. However, "an official's failure to alleviate a significant risk that he should have perceived

but did not, while no cause for commendation, cannot under our cases be condemned as the

infliction of punishment." *Farmer*, 511 U.S. at 838.


Lyons contends that this case is about delay and  failure to provide prescribed preventative

treatment for his known urethral stricture condition, which led to  aggravation of  his condition.  He

acknowledges the requirement of "verifying medical evidence" for harm due to delay in treatment.

The verification requirement, though , has undergone some refinement since it as announced in

---

[9] *Perez* adopts the "objectively serious" standard used by other circuits, which had been contrasted to the Sixth
Circuit's  "sufficiently serious" standard of incarceration under conditions posing a substantial risk of serious harm, so
as to avoid the unnecessary and wanton infliction of pain.  See *Blackmore,* 390 F.3d at 896-97.

[10] Lyons argues that his medical records constitute "verifying medical evidence" citing *Blackmore*. (ECF # 247
p. 9). There is not support for this argument in that decision, but his premise appears correct.

4:03 CV 1620                                           25

*Napier v. Madison County, Ky.*,  as part of the objective component of the deliberate indifference

test See *id*., 238 F. 3d 739, 742 (6th Cir. 2001). In *Napier* the Sixth Circuit adopted the requirement

that "[a]n inmate who complains that delay in medical treatment rose to a constitutional violation

must place verifying medical evidence in the record to establish the detrimental effect of the delay

in medical treatment to succeed." *Id.,* 238 F. 3d at 742.  Lyons argues that the medical records

should suffice for this showing.


However, *Napier*'s medical verification requirement has since been restricted to those cases

involving "minor maladies" to the extent when a prisoner claims that delay of treatment violates the

Eighth Amendment, the prisoner must present "'verifying medical evidence'  to establish the

detrimental effect of the delay." See *Blackmore v. Kalamazoo County*, 390 F.3d at 898 [11]; *Cain v.

Irvin*, 286 Fed. Appx. 920, 926 (6th Cir. Jul 17, 2008)(unreported).  Lyons' argument seeks extension

of the common knowledge exception for state malpractice claims into the Eighth Amendment realm,

so no specific medical verification to establish a "sufficiently serious" condition would be necessary

under Lyons' reasoning. Compare *Napier*, 238 F.3d at 742 (examination of the effect of delay in

treatment will often afford the court with the best available evidence on the question of whether the

---

[11]   In sum, the "verifying medical evidence" requirement is relevant to those claims involving minor maladies or non-obvious complaints of a serious need for medical care. *Napier*, which was relied upon by the district court, falls within this branch of decisions. In a word, *Napier* does not apply to medical care claims where facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers. *Napier* applies where the plaintiff's "deliberate indifference" claim is based on the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious. In such circumstances, medical proof is necessary to assess whether the delay caused a serious medical injury.  *Napier*, 238 F.3d at 742.

*Blackmore v. Kalamazoo County,*  390 F.3d 890, 898 (6th Cir. 2004)

4:03 CV 1620                                        26

alleged deprivation is sufficiently serious). Lyons' loss of urethral function cannot be said to

constitute a minor malady.


*Dr. Quinn, Dr. Manenti, and  HSA Azam:*

Lyons alleges in his motion for temporary emergency transfer that Dr. Peterson had stated

around March 21, 2003, that the surgical healing time would be at least 4 months. (ECF #11, ¶20).

However, Lyons' states in his affidavit, "On 3/21/03, Dr. Peterson stated that full internal healing

of the perineal urethrostomy could take another month or so." (ECF # 229-4, ¶2042). Lyons was

transferred from FMC-Butner on April 1, 2003, as approved  by Drs. Blair and Bonner. (Aff. ECF

# 229-4 ¶2027- 2034).  Lyons complains that defendants had approved Dr. Blair's EMS-413-060

medical discharge summary, which was then forwarded to the Bureau of Prisons.  Lyons has not

demonstrated gross neglect and clearly he cannot establish the subjective component of *Farmer*

since the prison officials had relied on medical opinions on Lyons' state of health prior to transfer,

even though those doctors' opinions conflicted with Dr. Peterson's. "Where a prisoner has received

some medical attention and the dispute is over the adequacy of the treatment, federal courts are

generally reluctant to second guess medical judgments and to constitutionalize claims which sound

in state tort law." *Westlake v. Lucas,*  537 F.2d 857, 860 n.5  (6th Cir. 1976); and see *Graham ex*

*Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004). Lyons' affidavit

presents no genuine issue of material fact to support the claims that defendants violated Lyons'

Eighth Amendment rights by failing to follow Dr. Peterson's recommendation regarding healing

time, or transferred Lyons before he was stable. Lyons' affidavit does not state any restriction

against transfer from Dr. Peterson. (¶2038-2042).

4:03 CV 1620                                    27

Defendants did ignore Dr. Peterson's suggestion that Lyons see Dr. Donatucci at DUMC for his complaints of "ED." (Aff. ¶2064, 2066). Resolution of this claim turns on whether erectile dysfunction constitutes a "serious medical need." A serious medical need is defined as a condition diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Perez,* 466 F.3d at 423-424. There is no evidence that erectile dysfunction was life-threatening, painful, or that any physician stated that its treatment was mandated. Further, the record establishes that this condition was unrelated to Lyons' other medical problems:

> 74.  On 6/4/2001, Dr. Marrero completed a BOP Medical Transfer Summary of Lyons stating that Lyons' urethral stricture condition was stable and that Lyons' complaint of erectile dysfunction was not related to previous surgeries or the stricture according to Dr. Ray. See BOP MRs, Exh. E;
>
> *Lyons v. U.S.,*  2008 WL 141576, 6 (N.D.Ohio).

Erectile dysfunction based on this record did not constitute a "serious medical condition." See also *Neal v. Suliene,* 2008 WL 4167930, 3 (W.D. Wis.)(erectile dysfunction is not serious medical condition).

Lyons arrival at FCI-Elkton on July 2, 2003 was accompanied by medical intake screening, and after Lyons request for wound care and dressing changes he was told by the nursing staff to stop complaining or be locked up in isolation. (Aff. ¶2167-2178). The following day, Lyons repeated his requests and was told that Dr. Quinn would be informed, but for the next four weeks Lyons received only gauze patches for wound care, was not provided with medical mesh support briefs to contain the wound dressing, and he complained about burning and pain at the wound site. A nurse's

4:03 CV 1620                                           28

examination revealed an open wound with lesions and discharge. (¶ 2179-2187). Lyons continued

to bleed into his underwear. (¶ 2194).

On July 9, 2003, Lyons began to complain of increased difficulty urinating with burning and

was given gauze bandages. (¶2199-2202). A medical culture was ordered, which indicated *E. coli*

infection, and on July 16, 2003, Lyons was issued an antibiotic. (¶ 2204-2207).

Although the nursing staff said that they would speak to Dr. Quinn or Dr. Manenti, Lyons

did not see Dr. Quinn until August 19, 2003 (¶2190, 2203, 2211, 2217,2224-2237).  Lyons has not

established that either doctor was in fact informed of his complaints or knew the status of the

medical care Lyons was receiving. Lyons statements establish that when Dr. Quinn did see Lyons

he attempted to catheterize Lyons and prescribed another antibiotic. (¶2224-2236). Dr. Quinn

believed that Lyons urination difficultly was related to infection.  Lyons asked for a urological

specialist and experienced post-catheterization bleeding from the attempted catheterization (¶ 2233-

2237).

Dr. Quinn did treat Lyons.  Even though Lyons was dissatisfied and believed that Dr. Quinn

was unfamiliar with perineal urethrostomy,  Lyons has not presented a claim under *Estelle v.*

*Gamble,* but only mere dissatisfaction with medical judgment, which is not actionable under the

Eighth Amendment. See *Id.*, 429 U.S. at 107, 97 S.Ct. at 292-293 (a number of possible medical

options were not pursued).  Under the Eighth Amendment, a prisoner is not entitled to demand

4:03 CV 1620                                29

specific care, or the best care possible.  See *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997);
*Tucker v. Ganshimer*, 2008 WL 4452722, *7 (N.D. Oh.)


Two days later on August 21, 2003, Lyons complained to HSA Azam about the straining
required to urinate and bladder retention was confirmed by medical staff. (¶2241-2245). Lyons was
taken that same day for emergency room treatment at St. Elizabeth's Hospital, where the physician
was unable to catheterize Lyons and he was admitted for urological surgery. (¶ 2246-2248). Dr.
Pichette inserted a suprapubic catheter supported by four stitches. (¶2252-53).  After surgery, Lyons
was told by Dr. Pichette that the perineal urethrostomy had collapsed and would require the
expertise of urological specialists at the Cleveland Clinic or the expertise of the urologist who
performed the surgery. (¶ 2254-2258). Obviously, HSA Azam did not act with indifference to
Lyons' serious medical needs.


Lyons follows with allegations of the inept treatment by the medical staff at FCI-Elkton and
the failure to follow Dr. Pichette's post-operative instructions including the progressive upgrading
the diameter of the catheter.(¶2265-2299).  However, it was not until September 23, 2003, that
Lyons  met with HSA Azam requesting  a specialist from the Cleveland Clinic, and a urological
consult for the monthly change of the suprapubic catheter (¶2300-2308). This was one month from
Lyons' treatment by Dr. Pichette and it was time for that doctor's recommended "upgrade" to a No.
16 catheter. (¶2259).  HSA Azam on that date informed Lyons that he would contact a urologist
about a suprapubic catheter change and request redesignation to FMC-Butner (¶2309-10). On
October 8, 2003, a transfer request to FMC-Butner  was submitted which had been reviewed and

4:03 CV 1620                                              30

approved by Dr. Quinn, HSA Azam and Warden Bezy. (¶ 2324-2325). Lyons remained at FCI-Elkton until November 4, 2003 when he was transferred to FMC-Butner. (¶ 2396)

Meanwhile, on October 3, 2003, Lyons reminded Dr. Quinn that his catheter upgrade was two weeks overdue, and two of the four sutures holding the catheter in place had failed. (¶2311-2312).  Dr. Quinn responded with increased wound care for the suprapubic catheter due to irritated and excoriated tissue, and secured the catheter with glue and tape  for suture failure. (¶2311-2319).  Dr. Quinn said he would contact Dr. Pichette about replacement. (¶2320).

On October 15, 2003, Lyons had a meeting with HSA Azam and Dr. Quinn. (¶ 2328-2340).  Dr. Quinn again stated that he would contact Dr. Pichette about replacement (¶2340). Lyons complained to both Dr. Quinn and HSA Azam that catheter looseness was impairing drainage and the upgrade was more that 3 weeks overdue. (¶ 2328-2335). He pointed out that only one suture remained to hold the catheter and the prior application of glue and tape had "eroded." (¶ 2329-2330).  Lyons was also concerned about repairing the perineal urethrostomy before further scarring set in and that he would have no urine drainage if the suprapubic catheter failed since the perineal urethrostomy was obstructed. (¶ 2333, 2236). He also complained of increasing burning and pain at the catheter incision site. (¶ 2334).  Lyons suggested that he be sent to the Cleveland Clinic for urological consult as Dr. Pichette had stated that repair would require the expertise of a urologist at the Cleveland Clinic. (¶ 2257, 2337)   HSA Azam told Lyons that a urological consult had been scheduled within 3 to 4 weeks concerning the perineal urethrostomy. This put the upgrade more than one and one-half months overdue from Dr. Pichette's recommendation.  Dr. Quinn said, once again,

that he would contact Dr. Pichette about replacing the suprapubic catheter and to resecure the catheter. (¶2339-2340).

The next day on October 16, 2003, the suprapubic catheter dislodged from Lyons' bladder causing urine leakage into the abdomen. ( ¶2341-43). Lyons experienced complete and painful bladder retention and obstruction. (¶2344-45).  Nursing staff at FCI-Elkton unsuccessfully attempted irrigation causing more pain and fluid into the abdomen, and contacted Dr. Pichette.  Lyons was told that Dr. Pichette refused to see him (¶2346-2352).  HSA Azam and Dr. Manenti approved transport to St. Elizabeth's Hospital. (¶2353-2354). At the emergency room a smaller suprapubic catheter was inserted with no supporting flange or sutures and the physician said it needed to be more securely held in place, and upgraded to a larger catheter as soon as possible by a urologist. (¶ 2355-59). (Lyons, though, did not see a urologist until December 2003, a Dr. Tash at DUMC.(¶ 2453)).

First, Lyons statements in his affidavit are insufficient to establish a causal link between the preceding events and perineal urethrostomy collapse on August 21, 2003, the suprapubic catheter failure on October 17, 2003, or the urethral  scarring and permanent damage that now exists. "*[P]ost hoc, ergo propter hoc* is not a rule of legal causation." *Abbott v. Federal Forge*, 912 F.2d 867, 875 (6th Cir. 1990)(meaning "after this, therefore because of this."). Although Lyons is relieved of the "medical verification" requirement since his case does not concern a minor malady, he must yet present medical expert evidence to show proof of causation when the complaint involves a sophisticated medical condition. See *Alberson v. Norris*, 458 F.3d 762, 765-66 (8th Cir. 2006); *Brightwell v. Lehman*, 2007 WL 2479682, *4 (W.D. Pa.); *Rigney v. Marcum*, 2007 WL 2979931,

4:03 CV 1620                                    32

*11 (E.D. Ky.)("A lay *post hoc, ergo propter hoc* analysis simply does not suffice in the context of sophisticated medical assessment.")

Second, this is not a matter where an unknowledgeable prison official interfered with medical treatment. Dr. Quinn delayed the catheter upgrade, and the catheter did dislodge. Aside from the lack of causal nexus, Lyons presents a mere difference in opinion over his treatment.  A prison staff physician's failure to follow the advice of the outside private physician "suggests nothing more than a difference in medical opinion." *Clifford v. Doe*, 2008 WL 5210663,*1(5th Cir.)(unpublished)(citing *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999)).  Lyons presents a mere dispute  over the adequacy of the treatment, which is insufficient to raise an Eighth Amendment claim See *Westlake v. Lucas,*  537 F.2d at 860 n.5. Again "[t]he plaintiff mus show more that medical malpractice and negligence on the part of the defendant because the subjective requirement acts to prevent the constitutionalization of medical malpractice claims." *Maddle v. Correctional Medical Services, Inc*., 2008 WL 839715, *4 (M.D. Tenn.)(citing *Comstock*, 273 F.3d at 703).

Lyons  returned to FCI-Elkton and saw Dr. Quinn on October 17, 2003 (¶2365-2382). Lyons complained that the new catheter was held in place only by tape and gauze, and needed to be upgraded in size, needed to be properly secured before it failed like the previous one. Dr. Quinn applied more glue and told Lyons that urological consults were the responsibility of Dr. Manenti and HSA Azam, and that Dr. Pichette and Dr. Black would not see Lyons, and no urologist withing a 40 mile radius would see him because of the lawsuits against Dr. Black and Dr. Pichette. Lyons

quibbled with Dr. Quinn over the fact that Lyons had not sued Dr. Pichette. Lyons also states that Dr. Quinn's statements about these doctor's refusal to treat him were untrue. (¶ 2383-2384) , yet he admits that the October 8, 2003 transfer request indicated that FCI-Elkton's usual urological consultant, Dr. Black had refused to see him due to this lawsuit. (¶2387). Regardless though, Dr. Quinn had stated that ordering a consult was not his responsibility and Lyons has not overcome this statement. Dr. Quinn did add glue to hold the catheter and did state he would speak to HSA Azam and Dr. Manenti about a urological consult. Dr. Quinn did not act with deliberate indifference on this instance.

Lyons does not demonstrate Dr. Manenti's personal involvement in delay of the medical consult until December 2003. Lyons's facts show that on October 17, 2003 Dr. Quinn stated he would speak to HSA Azam and Dr. Manenti about the urological consult. (¶ 2832). Lyons has demonstrated HSA Azam's personal involvement, but there are no facts establishing that Dr. Manenti was aware of or took part in the interference with Lyon's medical treatment. Dr. Manenti is not mentioned until November 4, 2003 when Lyons was transferred to FMC-Butner by special air charter on order of HSA Azam, Dr. Manenti, Dr. Quinn, A. W. Hertel and Warden Bezy (¶ 2396).

Lyons goes on to claim that the failure to timely schedule a urological consult caused the perineal urethrostomy to collapse, that the insertion of the suprapubic catheter on August 23, 2003, damaged his bladder, negligent care caused a urinary tract infection, and failing to schedule a urological consult to re-evaluate and restore the failed perineal urethrostomy caused an increased

4:03 CV 1620                                    34

level of scarring and more severe re-operation in December 2003. (¶2358).  However, Lyons fails

to set forth more than conjecture to support these claims or identify facts to demonstrate that Dr.

Manenti, Dr. Quinn or HSA Azam were *personally* responsible. Lyons, however has established

with irrefuted facts that Dr. Quinn and HSA Azam infringed on his Eighth Amendment protection

by deliberate indifference to Lyons medical needs following the August 2003collapse of the perineal

urethrostomy and disregard of Dr. Pichette's instructions for emplacement of a larger suprapubic

catheter at the end of September 2003, and Dr. Quinn's failure to resecure the catheter.


       The greater issue, though, is the degradation of Lyons' urethra. Lyons' affidavit provides

comparative recitation of physical findings to support his claim of delay of treatment was the cause.

However, Lyons has not established subjective deliberate indifference that HSA Azam or Dr. Quinn

or Dr. Mentari knew but disregarded risks caused by delay.  Lyons must show at least that there was

disregard of underlying facts which were strongly suspected to be true or a refusal to confirm

suspected  inferences of risk. See *Farmer*, 511 U.S. at 843 n.8. Deliberate indifference is not an

equivalent of medical malpractice so "[w]hen a prison doctor provides treatment albeit carelessly

or inefficaciously, to a prisoner, he has not displayed deliberate indifference to a prisoner's needs,

but merely a degree of incompetence which does not rise to the level of a constitutional violation."

*Comstock*, 273 F.3d at 703.


       Further, Lyons recites extensively instances of neglectful care by staff. These instances do

not demonstrate direct personal involvement by HSA Azam, Dr. Quinn or Dr. Manenti in treatment

or the lack of treatment that allegedly caused physical deterioration of Lyons condition while he was

4:03 CV 1620                                      35

under the care of these individuals. As in civil rights actions, mere prison supervisory responsibility

does not equate with liability. See *Copeland v. Machulis,* 57 F.3d 476, 481 (6th Cir. 1995)(no

respondeat superior for claims asserted under 42 U.S.C. §1983); *Okoro v. Scibana,* 63 Fed.Appx.

182, 184, 2003 WL 1795860, 2 (6th Cir.2003)(same under *Bivens*); *Kesterson v. Lutrell*, 172 F.3d

48 (Table), 1998 WL 894843 (6th Cir.).

*Associate Warden Brian Hertel, Warden Mark A. Bezy, Regional Director Mickey E. Ray, David*

*Hicks from the Office of Medical Designations and Transportation, and Harley G. Lappin, Director*

*of the Federal Bureau of Prisons:*

Lyons complains that his transfer to FCI-Elkton resulted in a denial of medical treatment

while *en route.*(ECF # 11, ¶47d) His affidavit states that while in transit at a number of facilities,

he was without access to wound care supplies and experienced infections, bleeding, incontinence

and unnecessary pain. He identifies Physician's Assistant Spiller at FMC-Butner as refusing to

provide wound care supplies, failing to list required wound care supplies,  or examine for perineal

urethrostomy wound care needs.  He lists other unidentified medical care providers for instances of

inattentiveness to known medical needs as failing to provide dressings or bandages for perineal

wound care (so Lyons substituted toilet paper), at another time receiving only four gauze bandages,

and leaving an upper urinary tract infection untreated.(Aff. ¶ 2083- 2162).  Critically, Lyons has

failed to show that these defendants had control over where he was transferred, or acted with

deliberate indifference when they ordered transfer to facilities which provided grossly inadequate

medical attention. As in civil rights actions, mere prison supervisory responsibility does not equate

with liability. See *Copeland v. Machulis,* 57 F.3d 476, 481 (6th Cir. 1995)(no respondeat superior

for claims asserted under 42 U.S.C. §1983); *Okoro v. Scibana*,  63 Fed.Appx. 182, 184, 2003 WL

1795860, 2 (6th Cir.2003)(same under *Bivens*); *Kesterson v. Lutrell*, 172 F.3d 48 (Table), 1998 WL

894843 (6th Cir.). Lyons' affidavit does not demonstrate facts within his personal knowledge to

establish  either the objective component or subjective components of this claim. At best Lyons

establishes neglect and failure, but "'an inadvertent failure to provide adequate medical care cannot

be said to constitute' a violation of the Eighth Amendment." *Estelle*, 429 U.S. at 105.


Related to this claim, Lyons maintains that these defendants were also responsible for a

failure to follow Dr. Peterson's medical recommendations on healing time, wound care and

specialist followup. (ECF # 11, ¶47b). Again, Lyons' affidavit does not establish personal

involvement. This same deficiency exists with respect to Lyons claims of failing to schedule a

urological consult, causing a suprapubic catheter to be emplaced in August 2003, failing to follow

Dr. Pichette's recommendations,  responsibility for increased urethral scarring, sending Lyons to

FMC-Butner when the Cleveland Clinic was available, and engaging in a continued pattern of delay

and withholding of medical treatment. (ECF # 11, ¶47f-l).


Lyons next contends that Defendants Lappin and M.E. Ray provided poorly trained medical

staffs at facilities under their control. ( ECF # 11, ¶47e).  A "failure to train" claim is actionable

against prison officials once it is established that the official had responsibility and notice (to

establish deliberate indifference) that training procedures were inadequate and likely to result in an

4:03 CV 1620                                    37

Eighth Amendment violation under *Estelle v. Gamble*. See *Whitt v. Stephens County*, 529 F.3d 278,

284 (5th Cir. 2008); *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001). Again, liability cannot be

based on *respondeat superior,* and Lyons' affidavit does not demonstrate facts  to establish either

the objective or subjective components of this claim.


Lyons further contends that Lappin and Hicks knowingly transferred him before he had

healed. (ECF # 11,¶47c).Transfer from FMC-Butner and its services through DUMC had been

approved  by Drs. Blair and Bonner. (Aff. ECF # 229-4 ¶2027- 2034). Lyons' affidavit again does

not state that Dr. Peterson recommended against transport or that there was a  medical risk in

transport, or that Lyons' condition was unstable. He merely stated that Lyons' operation had not

fully healed. (¶2038-2042). Also Lyons argument that his facts demonstrate a violation of PS

6000.05, a BOP regulation governing prisoner transfer fall far below the constitutional threshold for

establishing deliberate indifference. Again, defendants actions were supported by medical approval.

There was no deliberate indifference and additionally no regulatory violation.



*FTCA:*

The FTCA waives the United States' sovereign immunity from tort suits and  is exclusive

of any other civil action or proceeding for money damages  "arising from or resulting from a

negligent or wrongful act or omission of any employee of the Government while acting within

the scope of his office or employment."   See 28 U.S.C. §2679(b)(1); *Woods v. McGuire*, 954

4:03 CV 1620                                         38

F.2d 388, 390 (6th Cir. 1992). Liability under 28 U.S.C. §1346(b) of the FTCA is governed by

state law and this extends to claims of medical malpractice. See *Vance v. U.S.*, 90 F.3d 1145,

1148 (6th Cir. 1996); *Sellers v. U.S.*, 870 F.2d 1098, 1101 (6th Cir. 1989); and *see Federal*

*Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 478, 114 S.Ct. 996, 1001, 127 L.Ed.2d 308 (1994)( In

a federal tort claims action it is the law of the state where the events occurred that controls.).


Ohio's standard of medical malpractice would apply at FCI-Elkton, and as discussed

previously, Lyons allegations against Dr. Quinn and Dr. Manenti require medical expert

evidence, which he lacks, save the one instance where Dr. Quinn disregarded Dr. Pichette's

recommendation for a larger suprapubic catheter. See *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 77

O.O.2d 184, 346 N.E.2d 673 (1976). The lack of care from HSA Azam and Dr. Quinn during

September and October, 2003 that culminated in catheter failure is an instance of gross

inattention to obvious situations. See *Buerger*, 64 Ohio App.3d at 399; *Jones v. Hawkes Hosp.*

*of Mt. Carmel*, 175 Ohio St. 503, 196 N.E.2d 592, 26 Ohio Op.2d 170 (1964)


As for the other allegations against HSA Azam, his position is perhaps analogous to a

hospital administrator as defined under Ohio Rev. Code.§ 749.083. However, it is unknown what

authority he has to hire and fire employees for a claim of negligent hiring. In any event, Lyons'

statements do not suffice to support such a claim. [12] Regarding the actions taken regarding HSA

---

[12] Plaintiff must show (1) employment relationship, (2) employee's incompetence, (3) employer's knowledge
of the incompetence, (4) the employee's act or omission causing injury, and (5) a causal link between the employer's
negligence in hiring, supervising, and retaining and the plaintiff's injury. *Lehrner v. Safeco Ins./ Am. States Ins. Co.*,

4:03 CV 1620                                   39

Azam regarding treatment, Lyons' statements do not rise to demonstrate negligence. Granted

Lyons was not transferred expeditiously to FMC-Butner, but Lyons has only established that

transfer was requested by Azam after medical approval from Dr. Quinn, a required prerequisite,

and has not established that Azam caused any delay or for that matter had any control over the

situation.


        The liability of the United States for HSA Azam, Associate Warden Brian Hertel, and

Warden Mark A. Bezy is analogous to the liability of  Ohio's Department of Rehabilitation and

Correction for the negligent acts of its employees and it is liable. See *Tomcik v. Ohio Dept. of*

*Rehab. & Corr.,*  62 Ohio Misc.2d 324, 331, 598 N.E.2d 900, 905 (Ohio Ct. Cl. 1991). But such

a claim must be supported by underlying evidence of medical malpractice under *Bruni.  Id.* This

equates with liability of United States for the malpractice of Dr. Quinn and HSA Azam, which at

this point becomes moot since the United States bears responsibility as the substituted party.


        The same outcome occurs for the  claims in the supplemental complaint against  Regional

Director Mickey E. Ray, David Hicks from the Office of Medical Designations and

Transportation, and Harley G. Lappin, Director of the Federal Bureau of Prisons in regard to

their responsibility of the events at FCI-Elkton.  On the other hand these officials have no

liability under the law of North Carolina for the events at FMC-Butner.  As explained in

────────────────

171 Ohio App. 3d 570, 583, 872 N.E.2d 295 (2007).

4:03 CV 1620                                40

*Layman ex rel. Layman v. Alexander* with regard to suits brought against a public official in his

individual capacity:

> Under North Carolina Law, a public official is immune from personal liability for
> acts amounting to mere  negligence made in the performance of her duties, unless
> the alleged actions were "corrupt or malicious or ... outside and beyond the scope
> of [her] duties." *Slade v. Vernon*, 110 N.C.App. 422, 428, 429 S.E.2d 744, 747
> (1993). The North Carolina Supreme Court has defined malice as when a
> defendant "wantonly does that which a man of reasonable intelligence would know
> to be contrary to his duty and which he intends to be prejudicial or injurious to
> another." *Grad v. Kaasa*, 312 N.C. 310, 313, 321 S.E.2d 888, 890 (1984); *Bailey v.
> Kennedy*, 349 F.3d 731, 742 n. 7 (4th Cir.2003) (identifying two prongs of the
>  definition of malice under North Carolina law that must be met).

*Layman ex rel. Layman v. Alexander,*  343 F.Supp. 2d 483, 491 -492 (W. D. N.C. 2004).

Were Lyons' statements construed favorably to state a claim of negligence,this is

insufficient under North Carolina law to establish malice. Lyons does not offer evidence of

intent to harm by the named federal officials.[13]

### CONCLUSION AND RECOMMENDATION

For the foregoing reasons summary judgement is entered on the parites' cross-motions in

favor of the defendants associated with the first count of the amended complaint and the United

---

[13] *Layman* also contains a discussion of  official capacity claims under North Carolina law. *Id.*, 343 F. Supp.
at 492–493. However, 28 U.S.C. 1346(b)(1) states that the meter is "if a *private* person would be liable to the claimant
in accordance with the law of the place where the act or omission occurred. (emphasis supplied)." Accordingly, liability
under state law as determined under official capacity is irrelevant.

4:03 CV 1620                                    41

States, as substituted for the "federal defendants" associated with the supplemental complaint.

(ECF # 229, 239).

                                            s/James S. Gallas
                                            United States Magistrate Judge


        *ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of

Court within ten (10) days of mailing of this notice.  Failure to file objections within the

specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See*, *United*

*States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).



Dated: March 10,2009